# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SHIMMICK CONSTRUCTION COMPANY, INC., | DIVISION ONE |
| Appellant, | No. 79619-4-I |
| v. | PUBLISHED OPINION |
| STATE OF WASHINGTON, DEPARTMENT OF LABOR AND INDUSTRIES, | |
| Respondent. | |

DWYER, J. — Shimmick Construction Company (Shimmick) appeals from a decision of the Board of Industrial Insurance Appeals (the Board). The Board imposed penalties upon Shimmick for two serious violations of applicable crane safety regulations. Finding no error, we affirm.

I

In October 2016, Shimmick installed an underground electrical panel vault as part of a large construction project. This vault was composed of six concrete panel sections that, due to their weight, were required to be individually lowered into an open excavation. Directly above this excavation, and about 40 feet above street level, were three high-voltage power lines carrying a total of 26 kilovolts of electricity. These lines were not de-energized at the time Shimmick lowered the panel sections into place.

Shimmick was informed that, owing to the proximity of these energized power lines, a vertical crane was not a feasible option for this task. Thus, Shimmick decided to outfit two tow trucks with special equipment to facilitate lowering the panel sections. Each of the trucks was equipped with outriggers, a hoist line, and an extendible boom that, when fully extended and in the vertical position, could reach over 40 feet above the ground. Shimmick's plan was to lower each panel section individually by attaching the load to both tow trucks and moving the trucks' booms in tandem. Specifically, the trucks' booms, once attached to a panel section with the hoist line, would hoist the section from a flatbed trailer and move it horizontally toward the excavation, each boom retracting as it neared the other to prevent a collision.

Shimmick knew that the presence of energized power lines directly above the excavation would pose a risk—electrocution was possible even if no contact with the line was made. Thus, it planned the lifts to ensure that all of its equipment would remain more than 10 feet below the power lines. Shimmick employed dedicated spotters to keep watch and ensure that the booms did not contact the power lines. The spotters were equipped with air horns which were to be sounded if a boom appeared to be too close to a power line. Shimmick did not, however, believe that it was subject to Department of Labor and Industries (the Department) regulations restricting the operation of cranes beneath energized power lines.

On the day the lift was to take place, Shimmick positioned the tow trucks on opposite sides of the excavation. Each vehicle was placed about five feet from the edge of the excavation, almost directly below the power lines, and was operated by

2

remote control. Neither of the tow truck operators had obtained certification to operate a crane, and neither tow truck had been inspected, tested, or certified by an accredited crane inspector. Nevertheless, the lifts went as planned, and all six panel sections were successfully lowered into place.

The next day, the Department received a photograph from an anonymous source that showed the two tow trucks hoisting one of the panel sections in close proximity to the power lines. The Department sent an inspector, Mark Valgardson, to investigate. Valgardson met with Shimmick's on-site superintendent, Tim Harris. Harris told Valgardson that, although he was unsure of the mandatory clearance required between the booms and the power lines, "We were watching it. I had a spotter. We were watching."

Valgardson determined that the tow trucks were subject to the Department's crane regulations because they were employed to hoist and horizontally move a suspended load. In addition, Valgardson determined that these regulations prohibited equipment such as the truck-mounted booms, which were capable of reaching the energized lines when vertical and fully extended, from being operated anywhere beneath the lines. This led Valgardson to conclude that Shimmick's operation of the trucks beneath the energized lines exposed its workers to the risk of electrocution.

Accordingly, the Department cited Shimmick for several violations of the Washington Industrial Safety and Health Act of 1973[1] (WISHA). It issued two

---

[1] Ch. 49.17 RCW.

general violations: violation of WAC 296-155-53401(5)(a), which requires all cranes to be certified, and violation of WAC 296-155-53401(5)(g), which requires certification of crane operators. It also assessed two serious violations. The first was a violation of WAC 296-155-53408(2)(d)(i), which provides:

> No part of the crane/derrick, load line or load (including rigging and lifting accessories) is allowed below a power line unless you have confirmed that the utility owner/operator has deenergized and (at the worksite) visibly grounded the power line, except where one of the exceptions in (d)(ii) of this subsection apply.

The second was a violation of WAC 296-155-53401(5)(i), which allows

> crane operation near electric power lines only when the requirements of WAC 296-155-53408 have been met.

The total monetary penalty assessed for these violations was $4,800.

Shimmick appealed the citations. In its appeal, Shimmick argued that tow trucks are not subject to the Department's crane regulations and that, in any event, no employee was exposed to a substantial probability of serious injury, because the tow trucks' extendible booms never came within 10 feet of the power lines. In a proposed decision and order, an industrial appeals judge reduced both serious violations to general violations and reduced the monetary penalty to $0.

Both parties petitioned the Board for review of this proposed decision. After granting review, the Board affirmed the Department's citations as originally issued. It found, in relevant part, that

> 2. . . . Shimmick Construction Company used two tow trucks as cranes to lift the cement panels off a flatbed semi-truck and place them in the excavation. Each tow truck was equipped with a boom which, fully extended at its maximum 60-degree angle, would have reached 44 vertical feet toward the energized power line. In violation of WAC 296-

4

155-53408(2)(d)(i), these lifts were carried out directly under an energized 26 kV power line that was approximately 45 feet above the street surface. As a result employees were exposed to a hazard of electrocution . . . .

3. At the lift site . . . Tim Harris was the Lift Manager and Site Superintendent, and Jeff Pellham was the Site Foreman for Shimmick Construction Company. Both men were aware of the energized 26 kV line that was above the work site, in violation of WAC 296-155-53401(5)(i). As a result, employees were exposed to a hazard of electrocution as cited in Item 1-1b.

4. The two tow trucks used in the lift on October 20, 2016, by Shimmick Construction Company were "power operated equipment used in construction that can hoist, lower, and horizontally move a suspended load," and were used as such for this lift. They meet the definition of a "crane" as described in WAC 296-155-52902.

5. The tow trucks used in this lift were not certified as cranes prior to their usage pursuant to WAC 296-155-53401(5)(a) and as a result employees were exposed to possible injury.

6. The tow truck operators involved in this lift were not certified pursuant to WAC 296-155-53401(5)(g) prior to the October 20, 2016 lift and as a result employees were exposed to possible injury.

The Board rejected Shimmick's contention that there was no employee exposure to danger because there was no substantial probability of serious injury. As the Board's decision explained, "substantial probability" refers not to the likelihood that the harm will occur but, rather, the likelihood that any harm that *would* result from the violation would be serious injury or death. Because multiple employees were adjacent to the tow trucks as they performed the lifts and faced a risk of electrocution if any part of the equipment was energized, the Board found that Shimmick exposed its employees to this violative condition.

Shimmick appealed to the superior court, which affirmed the Board's decision. Shimmick appeals anew to us.

5

II

Shimmick first avers that substantial evidence did not support the Board's finding that the tow trucks used in its operation were, in fact, cranes. Thus, it asserts, the statutory and regulatory standards governing the use of cranes did not apply to its tow trucks. Shimmick is wrong. The unambiguous language of the applicable statute and the Department's regulations makes clear that tow trucks are considered cranes when they are used to hoist, lower, or horizontally move a suspended load, as occurred herein.

A

In a WISHA appeal, we review the Board's decision based on the record before the agency. Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 201, 248 P.3d 1085 (2011). The Board's findings of fact are conclusive if they are supported by substantial evidence. Erection Co., 160 Wn. App. at 202; RCW 49.17.150(1). Evidence is substantial if it is enough to convince a fair-minded person of the truth of the stated premise. Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009). We do not re-weigh the evidence on appeal. Potelco, Inc. v. Dep't of Labor & Indus., 194 Wn. App. 428, 434, 377 P.3d 251 (2016). Instead, we construe the evidence in the light most favorable to the party that has prevailed in the administrative proceeding. Frank Coluccio Constr. Co. v. Dep't of Labor & Indus., 181 Wn. App. 25, 35, 329 P.3d 91 (2014).

We review questions of law de novo and interpret agency regulations as if they were statutes. Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 137 Wn.

6

App. 592, 598, 154 P.3d 287 (2007).  We construe WISHA statutes and regulations "liberally in order to achieve their purpose of providing safe working conditions for every worker in Washington." Erection Co., 160 Wn. App. at 202.  Substantial weight is given to the Department's interpretation of WISHA.  Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wn. App. 906, 913, 83 P.3d 1012 (2003).  In interpreting WISHA, we may look to federal decisions that interpret WISHA's federal analogue, the Occupational Safety and Health Act of 1970[2] (OSHA), but we will not resort to federal case law when Washington law provides controlling precedent. Express Constr. Co. v. Dep't of Labor & Indus., 151 Wn. App. 589, 599 n.8, 215 P.3d 951 (2009).

Finally, we give no weight to a proposed decision and order.  Stratton v. Dep't of Labor & Indus., 1 Wn. App. 77, 79, 459 P.2d 651 (1969).  "A hearing examiner is merely an employee of the Board."  Stratton, 1 Wn. App. at 79.  Proposed decisions and orders are not the decisions and orders of the Board and "do not acquire that dignity until the Board formally adopts them."  Stratton, 1 Wn. App. at 79.

B

To prove a serious violation, the Department must prove each of the following: (1) the cited standard applies; (2) the employer did not meet the standard; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition, and (5) there is a substantial probability that death or

---

[2] 29 U.S.C. §§ 651-678.

serious physical harm could result from the violative condition.  Wash. Cedar, 119 Wn. App. at 914 (quoting D.A. Collins Constr. Co. v. Sec'y of Labor, 117 F.3d 691, 694 (2nd Cir. 1997)).  Whether the tow trucks, as used by Shimmick, functioned as cranes is determinative as to whether the cited standard applies.

The legislature has broadly defined a "crane" to mean "power-operated equipment used in construction that can hoist, lower, and horizontally move a suspended load."  RCW 49.17.400(5).  This provision also lists examples of such equipment including, but not limited to, "service/mechanic trucks with a hoisting device," "boom truck cranes," and "multipurpose machines when configured to hoist and lower by means of a winch or hook and horizontally move a suspended load." The Department has adopted this definition to determine when equipment is subject to its crane regulations.  See WAC 296-155-52902.

The tow trucks used here were power-operated equipment capable of hoisting, lowering, and horizontally moving a suspended load.  In fact, tow trucks fall outside the scope of crane regulations only "when used to clear wrecks and haul vehicles."  RCW 49.17.410(2)(c).  This narrow exemption is included in the Department's regulations at WAC 296-155-52900(4)(c).  However, when tow trucks are used to hoist, lower, or horizontally move a suspended load, they are functioning as cranes and are thus subject to the regulations governing cranes.

Shimmick presents no argument that the applicable definition did not encompass its trucks.[3]  Instead, Shimmick focuses on WAC 296-155-52900(1)(a)'s

---

[3] While Shimmick invokes the American Society of Mechanical Engineers' definition of a "crane" to support its argument, this definition is not the one adopted by the legislature or by the Department.

reference to a "multipurpose machine" as an example of a crane, arguing that because a tow truck is not a "multipurpose machine," it cannot be a crane.

The basis for this contention is the Board's statement that the tow trucks met the definition of "multipurpose machines," bringing them "within the auspices of Washington crane safety regulations." However, the Board did not rely solely on this notion to support its conclusion. To the contrary, it also found that "[t]he two tow trucks used in the lift . . . were 'power operated equipment used in construction that can hoist, lower, and horizontally move a suspended load,' and were used as such for this lift." The Board's statement regarding multipurpose machines should be construed simply as setting forth an alternative basis for its decision. The Board's primary finding—that "the evidence clearly established that the trucks were power-operated equipment being used to hoist, lower, and horizontally move the suspended concrete panel sections," making them cranes—relied on the broader definition of a crane that includes, but is not confined to, multipurpose machines.

Substantial evidence supports this finding. Shimmick indeed used the trucks as power-operated equipment for the purpose of lifting, lowering, and horizontally moving suspended concrete panel sections. Both tow trucks were equipped with outriggers, rotating extendible booms, and hoist lines. At the administrative hearing, Mark Valgardson explained that the trucks "had the ability to lift by means of a hoist or a winch" and could "under power swing horizontally the suspended loads." As Shimmick admits, it used the tow trucks for precisely this purpose, hoisting the concrete panel sections from their placement on a flatbed truck, horizontally moving them into position, and lowering them into the excavation.

9

Given that Shimmick used the tow trucks as cranes, and did not use the trucks to "clear wrecks" or "haul vehicles," no exemption applies to remove the trucks from the ambit of the legislature's definition of a crane. Substantial evidence supports the Board's finding that the tow trucks served as cranes.

### III

Shimmick next attacks the Board's finding that it violated crane safety regulations and, in doing so, exposed its employees to a hazard. This finding was unsupported, it asserts, because the trucks' booms did not come within 10 feet of an energized power line, and because its precautionary measures ensured that no accident would occur. We disagree.

Shimmick's desire is to advance a "no harm, no foul" theory of defense. Shimmick's purported 10-foot safety zone finds no support in the statute or applicable regulations. Instead, the Department's regulations prohibit crane operation in the entire area below an energized power line, not just crane operation within a certain distance from a line, when the crane is at all capable of reaching the line. Similarly, the likelihood that an accident would happen is irrelevant to the question of whether employees were exposed to a violative condition.

### A

To support its contention, Shimmick notes that Table 4 of WAC 296-155-53408 provides for a minimum clearance distance of 10 feet when a power line

transmits less than 50 kilovolts.[4] It reasons that, because there is no proof that the trucks and their booms actually came within 10 feet of the lines in question, no employees were exposed to a violative condition.

Shimmick is correct that, when a crane operates *near* power lines, the general rule provides a minimum clearance distance of 10 feet for any line of less than 50,000 volts. WAC 296-155-53408(2)(b). However, this does not extend to operation of a crane *beneath* a power line. Instead, WAC 296-155-53408(2)(d) provides:

> (d) Operations below power lines.
> (i) No part of the crane/derrick, load line or load (including rigging and lifting accessories) is allowed *below* a power line unless you have confirmed that the utility owner/operator has deenergized and (at the worksite) visibly grounded the power line, except where one of the exceptions in (d)(ii) of this subsection apply.
> (ii) Exceptions. (d)(i) of this subsection is inapplicable where you demonstrate that one of the following applies:
> (A) The work is covered by chapter 296-45 WAC.
> (B) For cranes/derricks with nonextensible booms: The uppermost part of the crane/derrick, with the boom at true vertical, would be more than 20 feet below the plane of a power line that is up to 350 kV, 50 feet below the plane of a power line that exceeds 350 kV or more than the Table 4 minimum clearance distance below the plane of the power line.
> (C) For cranes with articulating or extensible booms: The uppermost part of the crane, with the boom in the fully extended position, at true vertical, would be more than twenty feet below the plane of a power line that is up to 350 kV, fifty feet below the plane of a power line that exceeds 350 kV or more than the Table 4 minimum clearance distance below the plane of the power line.

---

[4] Table 4 provides, in pertinent part:

| Voltage (nominal, kV) | Minimum clearance distance (feet) |
|---|---|
| up to 50 | 10 |
| over 50 to 200 | 15 |
| over 200 to 345 | 20 |
| over 345 to 500 | 25 |
| over 500 to 750 | 35 |
| over 750 to 1,000 | 45 |

WAC 296-155-53408.

In arguing that no workers were in the "prohibited zone," Shimmick fails to acknowledge this specific rule. "'A specific statute will supersede a general one when both apply.'" Kustura v. Dep't of Labor & Indus., 169 Wn.2d 81, 88, 233 P.3d 853 (2010) (quoting Waste Mgmt. of Seattle, Inc. v. Utils. & Transp. Comm'n, 123 Wn.2d 621, 630, 869 P.2d 1034 (1994)). Here, the specific regulation prohibits any "part of the crane/derrick, load line or load (including rigging and lifting accessories)" from coming below a power line unless the utility owner confirms that the line is de-energized and visibly grounded. WAC 296-155-53408(d)(i). Exceptions exist for work on the transmission line itself, regulated by chapter 296-45 WAC, for cranes with non-extendible booms, and for circumstances when compliance is infeasible and the employer meets the requirements of WAC 296-155-53408(4).[5] Shimmick has not contended that these exceptions apply.

The exception applicable to cranes with extendible booms applies only when the "uppermost part of the crane, with the boom in the fully extended position, at true vertical" would be "more than the Table 4 minimum clearance distance below the plane of the power line." WAC 296-155-53408(2)(d)(ii)(C). If the crane's boom would reach the minimum clearance distance when "fully extended" and at "true vertical," the operator cannot bring any part of the crane, hoist line, or load under the line. WAC 296-155-53408(2)(d)(ii)(C).

---

[5] Among other things, the employer must "notify the crane safety program within the department of labor and industries," work with the power line owner or a registered professional engineer to determine the minimum clearance distance for the line, use an insulating link or device on the crane's load line, use nonconductive rigging and tag lines, and erect barricades to prevent any unauthorized personnel from approaching the crane. WAC 296-155-53408(4)(a), (d)(i), (e)(iv), (e)(vii), (e)(ix), (e)(x).

Shimmick argues that the tow trucks, as employed herein, could not physically reach the energized lines due to the tandem nature of the lift: the trucks, when connected to the suspended load, purportedly could not raise their booms to their full extendible height before tipping over. However, the exception in WAC 296-155-53408(2)(d)(ii)(C) is based only on a crane's design specifications, not the nature of a specific lifting operation. Thus, it does not matter that Shimmick did not intend to raise the booms to their full height, or that it was incapable of doing so in this instance. When the crane's boom can reach within the minimum clearance distance when fully extended and at true vertical, operation of any part of the crane beneath an energized power line is prohibited. WAC 296-155-53408(2)(d)(ii)(C).

Substantial evidence supports the Board's determination that the asserted exception did not apply. Shimmick does not dispute that the tow trucks' booms operated directly below the energized 26 kilovolt lines while the concrete panel sections were being lowered into place. The minimum clearance distance, as provided in Table 4 for power lines of this voltage, was 10 feet, meaning that the "plane" of clearance below the power lines would be 30 feet above ground level. When fully extended, the tow trucks' extendible booms could easily reach that height. In fact, even at only a 60 degree angle from the ground, one boom could reach 42 feet above ground level, while the other could reach 44 feet. This would bring the uppermost part of the equipment well above the plane of 30 feet. The result desired by Shimmick cannot obtain when its cranes could easily reach and surpass the plane of minimum clearance distance below the energized lines.

13

Thus, Shimmick violated the rule restricting crane operations underneath energized power lines, and cannot rely on any exception contained in the Department's regulations to excuse the violation.

B

Shimmick next asserts that, even if it did violate the applicable regulations that control the use of cranes near power lines, its employees faced no hazard and, thus, the finding of a serious violation was unsupported by the evidence. To the contrary, substantial evidence supports the finding that Shimmick's employees were exposed to a hazard.

As Shimmick acknowledges, the Department need not prove actual employee exposure to prove a serious violation. Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus., 136 Wn. App. 1, 5, 146 P.3d 1212 (2006)). Rather, an employer exposes its workers if they "'were exposed to, or had access to, the violative condition.'" Wash. Cedar, 119 Wn. App. at 914 (quoting D.A. Collins Constr. Co., 117 F.3d at 694). The Department must show by "'*reasonable predictability* that, in the course of [the workers'] duties, employees will be, are, or have been in the zone of danger.'" Mid Mountain, 136 Wn. App. at 5 (second alteration in original) (quoting Adkins v. Alum. Co. of Am., 110 Wn.2d 128, 147, 750 P.2d 1257, 756 P.2d 142 (1988)).

In an attempt to undermine the finding that exposure took place, Shimmick relies on a misapprehension of the meaning of "zone of danger." As the federal Occupational Safety Health Review Commission has stated, the zone of danger is "'that area surrounding the violative condition that presents the danger to employees

14

which the standard is intended to prevent.'" Sec'y of Labor v. Evergreen Tech, Inc., 18 BNA OSHC 1528, 1998 WL 518250, at *7 (No. 98-0348) (quoting Sec'y of Labor v. RGM Constr. Co., 17 BNA OSHC 1229, 1995 WL 242609, at *5 (No. 91-2107)). Here, Shimmick contends that the energized power lines posed no hazard so long as its trucks remained 10 feet from the lines. Citing the minimum clearance distance contained in Table 4 of WAC 296-155-53408, Shimmick argues that electrocution could occur only if "an object or worker contacted the power line or came within 10 feet of the line." Shimmick goes on to assert that, because there was no evidence that this occurred, it exposed no employee to a hazard. We disagree.

Again, the safety standard for operating cranes below energized power lines is not limited to the minimum clearance distance set forth in Table 4. Rather, the rule prohibits crane activities *anywhere* below a power line when a crane's design allows it to reach within the minimum clearance distance. WAC 296-155-53408(2)(d). Thus, a violative condition existed as soon as Shimmick began using its cranes underneath the power lines, and it was unnecessary for any part of the cranes to come within 10 feet of the line for a hazard to exist.

A standard that proscribes certain conditions "presumes the existence of a safety hazard." Frank Coluccio Constr., 181 Wn. App. at 41. "Thus, '[a]rguing that a hazard does not exist despite a violation is an impermissible challenge to the wisdom of the standard.'" Frank Coluccio Constr., 181 Wn. App. at 41-42 (alteration in original) (internal quotation marks omitted) (quoting In re Wilder Constr. Co., 2007 WL 3054874, at *4 (Wash. Bd. Indus. Ins. App. 2007)). "[I]f the violation concerns a specific standard, it is not necessary to *even* prove that a hazard exists, just that the

specific standard was violated." SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wn.2d 422, 434, 144 P.3d 1160 (2006).

Shimmick violated a specific safety standard when it used its cranes to place concrete panel sections beneath energized power lines. A hazard is presumed when a standard is violated. Frank Coluccio Constr., 181 Wn. App. at 41-42. Although the Table 4 minimum clearance distance sufficiently protects workers when a crane is used *near* an energized line, the Department has determined that additional protections are necessary when a crane is used *below* an energized line. WAC 296-155-53408(2)(d). As Valgardson testified, operating a crane beneath a power line in violation of this standard has "the potential to get people electrocuted, injured, and/or killed" because electricity can be conducted from the crane to equipment on the ground.

Substantial evidence supports the Board's finding that Shimmick exposed its workers to this violative condition. The tow trucks worked directly beneath the energized power lines and the zone of danger included the area surrounding the crane equipment. Valgardson testified that both the equipment and the load could become energized while operating beneath the lines. Shimmick's employees stood near the trucks on either side of the excavation as the concrete panel sections were moved into place. These employees were working in the zone of danger and Shimmick exposed them to the violative condition.

Shimmick's repeated mantra that an accident was impossible, because its precautions prevented the tow trucks from coming within 10 feet of the energized power lines, is unavailing. WAC 296-155-53408(2)(d)(i) simply prohibits any part of

a crane, load line, or load from coming beneath an energized power line. Shimmick took no steps to ensure that its equipment did not encroach into this prohibited area, meaning that any safety steps it did take were inadequate to prevent the violative condition and associated hazard.

An employer may not substitute its own judgment for the requirements of a specific safety standard. Danzer v. Dep't of Labor & Indus., 104 Wn. App. 307, 324-25, 16 P.3d 35 (2000). The crane regulations prohibit use of a crane below energized power lines and specify what an employer must do when compliance with the rule is infeasible. WAC 296-155-53408(2)(d)(ii)(D). There is no indication in the record that Shimmick complied with any of that rule's requirements.

Even were we to assume that Shimmick's alternative safety measures made an accident less likely, an employer's steps to decrease the likelihood of harm "are not relevant as to whether the violation was 'serious.'" Potelco, Inc. v. Dep't of Labor & Indus., 166 Wn. App. 647, 656, 272 P.3d 262 (2012). Therein, Division Two rejected an employer's assertion that a violation was not serious when "weather conditions, road speed and use, and the posted signs" made an accident unlikely. Potelco, 166 Wn. App. at 656. As the court explained, these arguments were pertinent only to determining the appropriate penalty to be assessed against the employer, not to whether a violation occurred. Potelco, 166 Wn. App. at 656-57. Put simply, in this type of endeavor, an employer exposes its employees to a violation even when it is "extremely unlikely" that anyone will actually be injured. Lee Cook Trucking & Logging v. Dep't of Labor & Indus., 109 Wn. App. 471, 481, 36 P.3d 558 (2001). A lessened likelihood of harm does not negate the fact that

17

Shimmick exposed its employees to a violative condition.[6]  The Board's conclusion that Shimmick exposed its employees to a violative condition was supported by its findings of fact.

Affirmed.

_____
Dwyer, J.

WE CONCUR:

_____          _____
Andrus, J.                         Appelwick, CJ

---

[6] Shimmick cites to a federal administrative case, Sec'y of Labor v. Rockwell Int'l Corp, 9 BNA OSHC 1092, 1980 WL 10706 (No. 12470), to support its contention that the Department must "prove more than just the possibility an employee may get injured."  The federal administrative decision does not align with Washington law.  Resort to federal case law is neither necessary nor proper when controlling Washington precedent exists.  Express Constr., 151 Wn. App. at 599 n.8.