# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FRANK COLUCCIO CONSTRUCTION )
CO., INC., )
               Appellant, )
                )
v. )
                )
WASHINGTON STATE DEPARTMENT )
OF LABOR & INDUSTRIES, )
                )
             Respondent. )
_____)

NO. 70334-0-I

DIVISION ONE

ORDER GRANTING MOTION
TO PUBLISH OPINION

Respondent Washington State Department of Labor and Industries moved on

April 11, 2014, to publish the opinion filed March 24, 2014, and the appellant has no

objection. The court has determined that the motion should be granted. Therefore, it is

ORDERED that the motion to publish opinion is granted.

DATED this _14th_ day of May 2014.

FOR THE PANEL:

2014 MAY 14 AM 9: 06
COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| FRANK COLUCCIO CONSTRUCTION CO., INC., | ) ) | NO. 70334-0-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | |
| WASHINGTON STATE DEPARTMENT OF LABOR & INDUSTRIES, | ) ) | PUBLISHED OPINION |
| Respondent. | ) ) ) | FILED: March 24, 2014 |

COURT OF APPEALS DIV I
STATE OF WASHINGTON
2014 MAR 24 AM 11: 31
FILED

LAU, J. — Frank Coluccio Construction Co. operated an excavator within 10 feet of an energized power line in violation of WAC 296-155-428(20)(a)'s 10-foot clearance requirement. The Board of Industrial Insurance Appeals (Board) affirmed the Department of Labor & Industries' "Citation and Notice of Assessment" against Coluccio for a serious violation of the Washington Industrial Safety and Health Act of 1973 (WISHA), chapter 49.17 RCW. The superior court affirmed the citation and assessment of penalties. Because substantial evidence supports the Board's findings of fact and its findings support its conclusion that Coluccio failed to prove its affirmative "infeasibility" defense, we affirm the Board's decision.

<u>FACTS</u>

Sound Transit hired Frank Coluccio Construction Company (Coluccio) to replace a damaged sewer main beneath Broadway Street between Denny Street and East Howell Street in Seattle's Capitol Hill neighborhood. At that location, Broadway has one northbound and one southbound lane—each 13 ½ feet wide—and an 11-foot wide center turn lane.

Metro buses powered by 18-foot high electric trolley lines run above Broadway. The high voltage trolley lines are 600-800 volts and located approximately 12 to 15 feet from the center of the road. Exposure to as little as 50 volts and 5 milliamps can cause death.

The sewer work required Coluccio to dig a trench approximately 250 feet long, 13 feet deep, and 5 feet wide down Broadway's center turn lane. Coluccio determined it needed a medium-size excavator with a boom (arm) length of about 20 feet for the project. According to Coluccio, a smaller excavator would be unable to dig to the necessary depth or to pull a trench box[1] around the work site.

Before starting the project, Coluccio's corporate safety director, Robert Clouatre, visited the work site to identify potential safety hazards. Clouatre saw the Metro trolley lines above Broadway. He knew the excavation project required Coluccio's employees to work within 10 feet of the trolley lines. He also knew about WAC 296-155-428(20)(a)'s requirement that employees must maintain a 10-foot clearance from

---

[1] A trench box is a structure placed inside a trench to protect workers from the risk of cave-in. <u>See also</u> WAC 296-155-650(q) (describing "trench boxes" as a type of "shield" or "shield system" used in trenches).

energized overhead lines when operating vehicles or mechanical equipment. That provision specifically requires:

> Any vehicle or mechanical equipment capable of having parts of its structure elevated near energized overhead lines shall be operated so that a clearance of 10 ft. is maintained. If the voltage is higher than 50kV, the clearance shall be increased 0.4 inch for every 1kV over the voltage. However, under any of the following conditions, the clearance may be reduced:
>> (i) If the vehicle is in transit with its structure lowered, the clearance may be reduced to 4 ft. If the voltage is higher than 50kV, the clearance shall be increased 0.4 inch for every 1kV over that voltage.
>> (ii) If insulating barriers are installed to prevent contact with the lines, and if the barriers are rated for the voltage of the line being guarded and are not a part of or an attachment to the vehicle or its raised structure, the clearance may be reduced to a distance within the designed working dimensions of the insulating barrier.

WAC 296-155-428(20)(a). Clouatre did not realize at the time that Metro's trolley lines were high voltage. He was not "used to high voltage lines being that low." Hearing Transcript (Feb. 1, 2012) (HT) at 142.

Project foreman Randy Brown also observed the trolley lines before work began. He knew Coluccio's employees would be unable to comply with WAC 296-155-428(20)(a)'s 10-foot clearance requirement due to the sewer's location in the street. Brown knew the trolley lines were energized and that portions of the excavator would be within 10 feet of the trolley lines at times.

Despite Clouatre and Brown's knowledge that Coluccio would be unable to achieve WAC 296-155-428(20)(a)'s 10-foot clearance requirement, Coluccio did not apply to the Department of Labor and Industries (Department) for a variance from that

regulation before starting work.[2] Clouatre had obtained variances from the Department in the past. On an earlier project, he obtained a variance when he knew Coluccio's employees would be working near electrical lines.

Rather than obtain a variance, Clouatre worked with Brown "to insure that we did not touch those lines." HT at 134. According to Clouatre, the two men discussed how Brown "was going to position all of his vehicles and his equipment and keep an eye and remind people on a regular basis how any time the excavator arm was articulating he'd be standing there spotting to make sure nobody got close to that." HT at 132. Brown explained that Coluccio backed the trucks "right next to the ditch" in order to load them in such a way that they never had the excavator's bucket under the overhead trolley lines. HT at 103. He explained that the excavator was placed to allow the operator to "always ha[ve] a visual with the wires." HT at 104. Brown stated that "most of the time" his job was to act as a spotter[3] for the excavator operator, Dan Mitchell. HT at 93.

No one told Mitchell before starting the work that he had to stay 10 feet away from the trolley lines. Mitchell knew the lines were energized. He never worked directly under the lines. The excavator's cab could rotate 360 degrees. Occasionally Mitchell had to turn the excavator so that the boom and bucket would leave the center line. This would bring the boom and bucket to the side of the excavator. Mitchell stated that when he connected the excavator's bucket to the trench box in the trench, the boom was

_____

[2] Under RCW 49.17.080, an employer can apply for a variance from a safety and health standard if the employer establishes it is unable to comply with the standard and meets several other requirements.

[3] A spotter is someone who observes equipment operation from the ground and gives a verbal or other audible alarm to stop the operator from getting too close to hazards.

approximately 8 to 10 feet away from the trolley lines. While spotting for Mitchell, Brown observed the bucket or boom come within 3 to 4 feet of the trolley lines.

On February 11, 2011, Department compliance safety health officer Randy Paddock was driving northbound on Broadway. He observed Coluccio's excavator dragging a trench box at street level from one end of the work zone to the other. The trench box was chained to the excavator's bucket. The excavator was traveling forward with its boom extended out in front of the trench box, which was being pulled.

While in his car, Paddock saw the boom's pivot point within 10 feet of the Metro trolley lines. Paddock also saw buses attached to the lines, confirming they were energized. Paddock was concerned that the chain attaching the excavator boom to the trench box could break, causing the boom to swing upward and contact the trolley lines. If the excavator had touched the energized lines, the operator's death was nearly certain. People standing close to the excavator would also be at risk of death or serious injury. Paddock parked his car and walked to the work site to perform a safety investigation. Clouatre and project manager Mike McGinley told Paddock they did not have a variance.

Safety devices exist to prevent a boom from moving upward or to restrict its movement. A nylon sling can act as a limit on booms. A limit switch can also be installed to limit the excavator's operation to preestablished parameters, allowing for control of the boom's height and swing. Coluccio's excavator had no nylon sling or a limit switch. The strobe light on the outside shroud of the excavator cab was not operating. Paddock saw no painted line on the ground as visual reminder of the necessary clearance from the overhead lines. Paddock observed no spotter. He talked

to foreman Brown about the use of a spotter, but no one identified a spotter on the work site. Brown acknowledged he was not spotting when the excavator was dragging the trench box. Brown claimed that a spotter was not needed at that time "[b]ecause the box was right next to our ditch was more than 10 feet away as far as I knew at the time." HT at 104.

Paddock warned Coluccio's employees against operating equipment within 10 feet of the energized overhead trolley lines. He gave them the telephone number of Department employee Steve Heist, who handled variances.

After the inspection, Paddock spoke with Department high voltage compliance supervisor Rick Evans. Evans testified that "qualified electrical workers" and employees working under a variance can work within 10 feet of high voltage lines. Evans explained that Coluccio employees received previous hazard awareness training and obtained a variance on a prior job involving work within 10 feet of energized lines. This, however, did not allow them to work within 10 feet of the energized trolley lines at the Broadway project.

After Paddock's inspection, Coluccio stopped excavation work and applied for a variance. Clouatre consulted with Heist regarding measures to protect Coluccio's workers. In its variance application, Coluccio proposed the following alternative protection measures:

> 1. This crew has been trained in a 4 hour electrical hazards recognition and procedures course by Seattle City Light. They performed excavation work in the Massachusetts St substation without any incident and worked near very high voltages. We will conduct a refresher of this course with site specific procedures discussed.
> 2. Daily prejob meetings will be held.

3. A foreman (not the one directing this work), that has already been thru the training mentioned in 1. above, will be assigned as safety watch. He will have no other duties. He is a competent person and will have full authority to stop the work and correct procedures.
4. The excavator used will have a limiter switch attached to it. An adjustable rod will be attached to the boom hoist cylinder that will move with the boom hoist cylinder rod up and down. A magnetic switch will be installed on the cylinder barrel that will trip when the rod passes by it. When the magnetic switch trips, it will close off the pilot oil used to control the boom hoist by using a solenoid valve. This will stop the excavator boom from extending any further. All other functions will still work including boom hoist down.

Ex. 1 at 1-2; Ex. 2 at 2.

On March 7, 2011, the Department issued an interim order allowing Coluccio to continue the sewer work if it maintained a minimum clearance of 4 feet from the trolley lines. The interim order required Coluccio to follow the safety measures it proposed in its variance application. The order also stated that the excavator would use the strobe light on the excavator's cab when the limit switch was activated and when the trolley was working directly under the lines. The order required Coluccio to paint a line 4 feet back from the trolley lines as a visual reminder of the clearance. The dedicated spotter's duties included ensuring that the operator did not swing the bucket beyond the limits of the truck's box and spotting for the excavator when it was within 10 feet of the energized lines. All crew members would be kept away from the excavator when it rotated to load trucks under the trolley lines. Further, Coluccio would hold daily safety meetings.

The Department cited Coluccio for a serious violation[4] of WAC 296-155-428(20)(a) stemming from Paddock's February 11 inspection and assessed a $1,200

---

[4] A serious violation in the workplace is defined as "a substantial probability that death or serious physical harm could result from a condition which exists, or from one or

penalty. A hearings officer affirmed the citation in a corrective notice of redetermination.

Coluccio appealed the corrective notice of redetermination to the Board. Before the

Board, Coluccio argued it was not feasible to comply with WAC 296-155-428(20)(a)'s

10-foot clearance requirement.

The industrial appeals judge (IAJ) issued a proposed decision and order affirming

the corrective notice of redetermination. The IAJ entered several findings of fact,

including findings rejecting Coluccio's infeasibility defense:

3. In February 2011, Safety Compliance Officer Randy Paddock observed a Coluccio employee operating a Komatsu 228 excavator with a 42-inch bucket within 10 feet of an overhead energized Metro bus trolley line without first obtaining a variance, in violation of WAC 296-155-428(20)(a).
4. The highest level of injury reasonably expected from unprotected exposure to energized trolley lines is death or serious injury.
5. At the time of this violation it was feasible to implement the compliance requirements, feasible to perform work operations after having implemented the compliance requirements, and feasible alternative protection was not in use.

Certified Appeal Board Record (CABR) at 36-37.

Coluccio petitioned for review to the three-member Board. The Board denied Coluccio's

petition and adopted the proposed decision and order as its final decision and order.

Coluccio appealed to superior court, alleging the Board "erred in all of its Findings of

Fact and Conclusions of Law" and further erred "in all evidentiary rulings adverse to

[Coluccio]." The superior court affirmed the Board. Coluccio appeals.[5]

---

more practices, means, methods, operations, or processes which have been adopted or are in use in such work place, unless the employer did not, and could not with the exercise of reasonable diligence, know of the presence of the violation." RCW 49.17.180(6).

[5] On appeal, Coluccio abandons its evidentiary challenges and appeals only the feasibility determination.

## STANDARD OF REVIEW AND APPLICABLE LAW

We review a decision by the Board based on the record before the agency. Legacy Roofing, Inc. v. Dep't of Labor & Indus., 129 Wn. App. 356, 363, 119 P.3d 366 (2005). In a WISHA appeal, the Board's findings of fact are conclusive if supported by substantial evidence. RCW 49.17.150(1); Inland Foundry Co., Inc. v. Dep't of Labor & Indus., 106 Wn. App. 333, 340, 24 P.3d 424 (2001). Substantial evidence is evidence in sufficient quantity to persuade a fair-minded person of the truth of the declared premise. Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009). We view the evidence and reasonable inferences in the light most favorable to the prevailing party—here, the Department. Erection Co. v. Dep't of Labor & Indus., 160 Wn. App. 194, 202, 248 P.3d 1085 (2011). Unchallenged findings are verities on appeal. Moreman v. Butcher, 126 Wn.2d 36, 39, 891 P.2d 725 (1995). If there is substantial evidence to support the findings, we then determine whether the findings support the conclusions of law. RCW 49.17.150(1); Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus., 136 Wn. App. 1, 4, 146 P.3d 1212 (2006).

The purpose of WISHA is to "assure, insofar as may reasonably be possible, safe and healthful working conditions for every man and woman working in the state of Washington . . . ." RCW 49.17.010. We construe WISHA statutes and regulations liberally to achieve their purpose of providing safe working conditions for workers in Washington. Inland Foundry, 106 Wn. App. at 336. See also RCW 49.17.050, .120, and .180.[6] We accord substantial weight to an agency's interpretation within its area of

---

[6] In interpreting WISHA, Washington courts look to federal decisions interpreting similar provisions of the Occupational Safety & Health Act of 1970, 29 U.S.C. chapter

expertise and uphold that interpretation if it reflects a plausible construction of the regulation and is not contrary to legislative intent. Roller v. Dep't of Labor & Indus., 128 Wn. App. 922, 926-27, 117 P.3d 385 (2005). But we retain ultimate responsibility for interpreting a regulation. Children's Hosp. & Med. Ctr. v. Dep't of Health, 95 Wn. App. 858, 864, 975 P.2d 567 (1999).

WISHA requires an employer to "furnish to each of his or her employees a place of employment free from recognized hazards that are causing or likely to cause serious injury or death to his or her employees." RCW 49.17.060(1). WISHA also imposes a specific duty requiring employers to "comply with the rules, regulations, and orders promulgated under [WISHA]." RCW 49.17.060(2); J.E. Dunn Nw., Inc., v. Dep't of Labor & Indus., 139 Wn. App. 35, 48, 156 P.3d 250 (2007). RCW 49.17.180 mandates the Department assess a penalty against an employer for a serious violation of WISHA. The Department bears the initial burden of proving a WISHA violation. WAC 263-12-115(2)(b); SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wn.2d 422, 433, 144 P.3d 1160 (2006).

To establish a serious violation of a WISHA safety regulation, the Department carries the burden to prove:

> "(1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition; and (5) there is a substantial probability that death or serious physical harm could result from the violative condition."

---

15. Asplundh Tree Expert Co. v. Dep't of Labor & Indus., 145 Wn. App. 52, 60, 185 P.3d 646 (2008); Wash. Cedar & Supply Co., Inc. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2004).

Wash. Cedar & Supply Co. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2003) (internal quotation marks omitted) (quoting D.A. Collins Constr. Co. v. Sec'y of Labor, 117 F.3d 691, 694 (2d Circ.1997)).

As noted above, the Department cited Coluccio for one serious WISHA violation: operating equipment within 10 feet of an energized power line in violation of WAC 296-155-428(20)(a). As is the case here, "if a specific standard exists, the standard is presumed feasible and the burden is on the employer to prove that it is not."[7] SuperValu, 158 Wn.2d at 434. To establish an affirmative "infeasibility" defense,

> "an employer must prove that (1) the means of compliance prescribed by the applicable standard would have been infeasible under the circumstances in that (a) its implementation would have been technologically or economically infeasible, or (b) necessary work operations would have been technologically or economically infeasible after its implementation, and (2) either (a) an alternative method of protection was used, or (b) there was no feasible alternative means of protection."

In re Longview Fibre Co., No. 98 W0524, 2000 WL 33217383, at *4 (Wash. Bd. of Indus. Ins. Appeals Oct. 27, 2000) (emphasis added) (quoting Sec'y of Labor v. Armstrong Steel Erectors, Inc., 17 BNA OSHC 1385, 1387, (No. 92-262, 1995)).[8]

We review for substantial evidence whether an employer has established an affirmative defense to a WISHA violation, including an "infeasibility" defense. Mowat Constr. Co. v. Dep't of Labor & Indus., 148 Wn. App. 920, 929, 201 P.3d 407 (2009);

---

[7] "'In its ordinary meaning an activity is "feasible" if it is capable of achievement, not if its benefits outweigh its costs.'" Aviation W. Corp. v. Dep't of Labor & Indus., 138 Wn.2d 413, 433 n.11, 980 P.2d 701 (1999) (quoting Indus. Union Dep't v. Am. Petroleum Inst., 448 U.S. 607, 719, 100 S. Ct. 2844, 65 L. Ed. 2d 1010 (Marshall, J., dissenting) (1980) (citing Webster's Third New International Dictionary 831 (1976)).

[8] The parties agree that the Board's decision in Longview, which quotes the Occupational Safety Health Review Commission's decision in Armstrong, correctly articulates the test for establishing the affirmative "infeasibility" defense.

BD Roofing, Inc. v. Dep't of Labor & Indus., 139 Wn. App. 98, 114, 161 P.3d 387 (2007) ("[S]ubstantial evidence supported the Board's decision that BD failed to establish the affirmative defense of employee misconduct."); Legacy Roofing, Inc. v. Dep't of Labor & Indus., 129 Wn. App. 356, 368, 119 P.3d 366 (2005) ("[S]ubstantial evidence supports the Board's determination that Legacy did not prove each element of its statutory affirmative 'unpreventable employee misconduct' defense . . . .").

Here, it is undisputed that Coluccio violated WAC 296-155-428(20)(a). The sole issue on appeal is whether the Board erred in rejecting Coluccio's "infeasibility" defense. To establish this defense, Coluccio must prove that (1) the means of compliance prescribed by the applicable standard would not have been feasible under the circumstances because (a) its implementation would have been technologically or economically not feasible, or (b) necessary work operations would have been technologically or economically not feasible after its implementation, and (2) either (a) an alternative method of protection was used, or (b) there was no feasible alternative means of protection. See Longview, 2000 WL 33217383, at 4. In sum, "[t]o prevail on an infeasibility defense, the employer must prove (i) that compliance with a particular standard either is impossible or will render performance of the work impossible; and (ii) that it (the employer) undertook alternative steps to protect its workers (or that no such steps were available)." Harry C. Crooker & Sons, Inc. v. Occupational Safety & Health Review Comm'n, 537 F.3d 79, 82, 22 O.S.H. Cas. (BNA) 1298, 2008 O.S.H.D. (CCH) P 32,971 (2008).

## ANALYSIS

Coluccio contends:

> Where the record reflects that [Coluccio] presented evidence to support a finding that the excavator was not operating directly underneath the energized trolley lines and [Coluccio] took numerous precautions to ensure that no contact was made with the trolley lines, the [Board] and the Superior Court erred in finding that [Coluccio] failed to establish its affirmative defense of impossibility or infeasibility of compliance.

Appellant's Br. at 8 (boldface omitted). As discussed below, we conclude that substantial evidence supports the Board's conclusion that Coluccio failed to prove it took other steps to protect its workforce from the specific hazard (here, electrocution) or that no such alternatives were feasible.[9]

Coluccio mainly contends that the alternative precautions outlined in the interim order and discussed above are irrelevant because they address future work, not the citation at issue. It specifically claims that the alternative safety measures described above and set forth in the interim order "are not applicable to the specific hazard cited by the Department and [are] not relevant to the citation." Appellant's Reply Br. at 13. It also claims that the Department "only cited [Coluccio] for the hazards associated with pulling the trench box." Appellant's Reply Br. at 13. In essence, Coluccio implies that none of the alternative safety considerations noted above are relevant here because

---

[9] Given our resolution, we need not address whether Coluccio failed to prove whether it was technologically or economically feasible to comply with WAC 296-155-428(20)(a). See Longview, 2000 WL 33217383, at *4.

-13-

they provide no protection for workers from the specific hazard cited by the Department.[10]

We disagree. First, the Department cited it for failing to maintain a 10-foot clearance from the trolley lines "in that a Komatsu excavator was used to move trench boxes <u>and dig a trench under the said power lines</u>." CABR at 40. Inspector Paddock testified that he "noticed the excavator working within 10 feet of power [lines]." HT at 11. He further expressed concern that "the excavator [was] operating within 10 feet of the energized bus lines." HT at 16. Coluccio misstates Paddock's testimony when it argues Paddock cited it only for hazards associated with pulling the trench box. On that point, during cross-examination, Paddock explained:

Q. Your observations were of the excavator pulling the trench box, correct?
A. Correct.
Q. And that's what the hazard is that you cited for in this particular case?
A. Correct.
Q. So in other words, we're only focusing on the fact of pulling the excavator box underneath the energized trolley line, correct?
A. <u>No. That's not correct</u>.
Q. Well, that's all you observed though, correct?
A. That's one of the main things I observed. <u>I did observe when the operator turned the excavator, pivoted the excavator to attach to that box</u>, that, that was - - and then pulling it. Those were the things I observed.
Q. Let me make sure I understand this correctly. Is when you observed the operator attaching the bucket to be attached to the excavator box as you saw it twisting or turning?
A. Yes.
Q. And then - -
A. Pivoting I guess.
Q. You're talking about the body of the excavator?
A. Correct.
Q. And then after it was attached, then you saw the excavator pull the trench box, and it passed underneath the trolley line?

---

[10] Here, Coluccio cites to testimony indicating the excavator never operated directly under the trolley lines and the excavator's boom would not have moved upward if the chain attaching it to the trench box had broken.

A. I did not see the box pass right underneath the trolley line. I'm looking this way. <u>The excavator's arm was within 10 feet of the trolley line</u>.

. . . .

Q. And so that was the only thing that you saw that comprises or creates the hazard and the exposure to that hazard for the purpose of this citation, correct?

A. <u>The operation of the excavator within 10 feet of the energized metro bus trolley lines, yes</u>.

HT at 52-54 (emphasis added). Regardless of the specific activity Coluccio was engaged in at the time, Coluccio was cited for violating WAC 296-155-428(20)(a)'s 10-foot clearance requirement.

Coluccio attempts to narrowly define the cited activity to avoid WISHA liability. It claims the specific work site activity at issue here involves dragging the trench box. But the testimony quoted above makes clear that Paddock was concerned about the general operation of the excavator within 10 feet of the energized lines. Further, a standard that proscribes certain conditions, here the 10-foot prohibition, presumes the existence of a safety hazard. <u>See In re Wilder Constr. Co.</u>, 2007 WL 3054874 at 3 (Wash. Bd. Indus. Ins. App.) 007) ("'The existence of a standard presumes that a hazard is present when the terms of the standard are not met.'") (quoting <u>Sec'y of Labor v. Complete Gen. Constr. Co.</u>, 19 BNA OSHC 1622, 2001 WL 856242 at *5 (CCH) P 32396, (OSHRC)). Thus, "'[a]rguing that a hazard does not exist despite a violation is an impermissible challenge to the wisdom of the standard.'" <u>Wilder</u>, 2007 WL 3054874 at *4 (Wash. Bd. of Indus. Ins. Appeals) (June 15, 2007) (internal quotation marks omitted) (quoting <u>Complete Gen. Constr. Co.</u>, BNA OSHC 1622, 2001 WL 856242 at *5). Where, as here, the regulation prohibits construction equipment from operating

within 10 feet of energized power lines, the regulation speaks for itself. The hazard sought to be prevented here is electrocution.

Testimony indicates that specific and feasible alternatives could have protected Coluccio's workers from the electrocution hazard, including use of a dedicated spotter and installation of a limit switch to restrict the excavator's range of motion. Substantial evidence indicates neither method was in use on February 11 when Paddock inspected the work site.[11] Coluccio avoids arguing that these alternative safety measures were not feasible. It asserts that they are irrelevant because they provided no additional protection to workers under the circumstances that occurred on February 11, 2011.

For example, Coluccio argues, "Not only is there no requirement to use limit switches, the application of a limit switch under the circumstances of the alleged violation would have been meaningless because the boom never worked underneath the trolley lines." Appellant's Br. at 12. But as noted above, Coluccio itself proposed a limit switch in its variance application as a way to protect its workers. Ex. 2 at 2; see also Ex. 1 at 2. Testimony indicated that a limit switch could restrict not only the boom's height, but also its swing. Mitchell testified that he turned the excavator occasionally so that the boom and the bucket left the center line. Brown testified that when the excavator cab rotated, the rotation brought the boom and bucket to the side of the excavator. The Board could reasonably have concluded that a limit switch and/or a

---

[11] Coluccio itself proposed adding a limit switch to the excavator in its postinspection application for a variance, noting in its application that when tripped, the switch would "stop the excavator boom cylinders from extending any further." Ex. 1 at 2. This provides additional evidence that it was feasible to use this particular safety measure before starting the work.

-16-

dedicated spotter were necessary means to ensure the excavator did not contact the

trolley lines during the trench work.[12]

To the extent Coluccio contends it implemented adequate alternative means of

protection by "carefully plann[ing] out the work sequencing of where the dump trucks

would be positioned to minimize any accidental contact between the excavator and the

power lines" and "provid[ing] specialized electrical training to ensure that the workers

were aware of the hazards of high voltage lines,"[13] the feasibility determination is

ultimately a factual one for the Board to weigh and determine.[14] Appellant's Reply Br. at

11. We decline to invade the province of the fact finder.

---

[12] Relying on Spancrete Northeast, Inc. v. Occupational Safety & Health Review Commission, 905 F.2d 589 (2d Cir. 1990) and Secretary of Labor v. A.J. McNulty & Co., 19 BNA OSHC 121, 2000 WL 1490235, Coluccio argues that because no specific regulation or standard requires the use of limit switches, "the Department, as a matter of law, cannot demonstrate that a failure to use a limit switch is sufficient to defeat the defense of infeasibility." Appellant's Br. at 12. Coluccio essentially argues there must be a specific WAC standard requiring a limit switch in order for such a device to be considered a feasible alternative method. This argument fails for several reasons. First, Washington case law does not require that only alternative means found in the WACs be used. See Longview, 2000 WL 33217383 at *4-5. Second, Coluccio's failure to use a limit switch was not the only basis for the Board's rejection of its "infeasibility" defense—Coluccio also failed to use several other feasible safety measures as discussed above. Finally, Spancrete and McNulty are narrow federal decisions that address enforcement of a specific federal regulation, 29 C.F.R. § 1926.28(a). There, the courts held that because of 29 C.F.R. § 1926.28(a)'s "lack of specificity and the generality of its language," the Secretary of Labor had the burden to prove that specific personal protective equipment was appropriate. Spancrete, 905 F.2d at 593-94; McNulty, 2000 WL 1490235 at *12. These cases are inapplicable to a specific regulation such as WAC 296-155-428(20)(a).

[13] We question the electrical training contention, as the record shows Coluccio's employees received the training in 2009 at another work location for a prior job. See Ex. 5. Clouatre admitted that he did not know the trolley lines at issue here were high voltage, thus, calling into question whether Coluccio's other employees knew or were adequately trained for the conditions at the Broadway work site.

## CONCLUSION

Because substantial evidence supports the Board's findings of fact and its findings support its conclusion that Coluccio failed to prove its affirmative "infeasibility" defense, we affirm the Board's decision.

WE CONCUR:

---

[14] This is especially true given that one of Coluccio's "precautions" involved foreman Brown spotting for the excavator operator, yet substantial evidence indicates no spotter was present at the time Paddock inspected the work site.