IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| BARTELL DRUG CO./BARTELL DRUG CO. 56, | ) ) ) | No. 80268-2-I |
| Appellant, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| WASHINGTON STATE DEPARTMENT OF LABOR AND INDUSTRIES, | ) ) ) | |
| Respondent. | ) ) ) | |

HAZELRIGG, J. — Bartell Drug Co. seeks reversal of an order by the Board of Industrial Insurance Appeals (BIIA) upholding a citation for a serious violation of the Washington Industrial Safety and Health Act (WISHA).[1] Bartell argues that the Department of Labor and Industries failed to show that its exit routes did not meet WISHA's requirements, thereby creating a hazard to its employees. Because substantial evidence supports the findings that the exit route did not meet the minimum width required by WISHA and Bartell's employees had access to the violative condition, we affirm.

## FACTS

In late 2016, the Department of Labor and Industries received a report of potentially unsafe working conditions at the Admiral Way location of Bartell Drug

---

[1] Ch. 49.17 RCW.

Co. in West Seattle. On December 7, 2016, Department safety inspectors Jason Smith and William Keely went to the store to conduct an inspection. The store manager consented to an inspection of the storage room in the back of the store.

Smith and Keely walked through and took photographs of the storeroom. The storeroom was approximately 15 to 20 feet wide and 75 to 100 feet long with a men's bathroom and employee break room at opposite ends. About halfway between the bathroom and the break room, there was a rolling bay door, similar to a garage door, for freight deliveries. At one end of the storeroom, next to the break room, was an emergency exit door.

The path through the storage room to the emergency exit door was lined with cardboard boxes stacked on one side and plastic merchandise totes on the other. Smith had forgotten his tape measure on the day of the inspection, so he estimated the width of the walkway between the boxes and the totes using his approximately 12-inch-long writing folder as a reference. Although the pathway varied in width, Smith estimated that the narrowest section was about 15 to 16 inches wide. Smith and Keely had to turn sideways to walk through that section of the corridor.

The store typically had up to ten employees working at one time. Employees passed through the storeroom to access the break room, the management office, the bathrooms, and merchandise. In addition to the emergency exit door in the storeroom, the location also had a main entrance at the front of the store and an emergency exit door near the pharmacy accessible from the sales floor.

Smith interviewed assistant manager Robyn Gardiner two days after the inspection and took notes during their conversation. Gardiner had not been working on the day of the inspection. The day before the inspection, a box on top of a metal cage in the storeroom had fallen forward when she opened the door to the cage and hit her on her head, causing a mild concussion. Smith noted that Gardiner told him that the back storeroom had been in the same condition since before Halloween. He also included a quote from Gardiner in his notes saying that she did not want to let customers enter the storeroom to use the bathroom because she was afraid something would fall on them. Gardiner later testified that she did not remember making these statements.

Based on this inspection, Smith believed that Bartell had committed a serious violation of the Washington Administrative Code (WAC) because the exit route through the storeroom was not at least 28 inches wide at all points. The Department issued a citation for a serious violation of WAC 296-800-31010 for failure to ensure sufficiently wide exit routes and a general violation of WAC 296-24-60705(10) for failure to ensure minimum vertical clearance below sprinklers in the store room. A penalty of $3,600 was assessed against Bartell for the serious violation.

Bartell appealed, requesting that the serious violation be amended to a general violation. The Department affirmed the violations and issued a Corrective Notice of Redetermination (CNR). Bartell appealed the CNR to the BIIA. After a hearing, the Industrial Appeals Judge issued a Proposed Decision and Order affirming the CNR. Bartell filed a petition for review. The BIIA denied the petition,

and the Proposed Decision and Order became the Decision and Order of the Board. Bartell sought judicial review of the Decision and Order in superior court, which also affirmed. Bartell then appealed to this court.

## ANALYSIS

### I. Standard of Review

On a WISHA appeal, we review the BIIA's decision directly, based on the record before the agency. Legacy Roofing, Inc. v. Dep't of Labor & Indus., 129 Wn. App. 356, 363, 119 P.3d 366 (2005). The findings of fact in the administrative decision are conclusive if supported by substantial evidence in light of the record as a whole. RCW 49.17.150(1); J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus., 139 Wn. App. 35, 43, 156 P.3d 250 (2007). Evidence is substantial if it is sufficient to persuade a fair-minded person of the truth of the premise. J.E. Dunn Nw, 139 Wn. App. at 43. We do not reweigh evidence on appeal but view the evidence in the light most favorable to the party that prevailed before the BIIA. Potelco, Inc. v. Dep't of Labor & Indus., 194 Wn. App. 428, 434, 377 P.3d 251 (2016). If there is substantial evidence to support the findings of fact, we then determine whether those findings support the conclusions of law. Frank Coluccio Constr. Co., Inc. v. Dep't of Labor & Indus., 181 Wn. App. 25, 35, 329 P.3d 91 (2014).

We review questions of law de novo, interpreting agency regulations as if they were statutes. Wash. Cedar & Supply Co., Inc. v. Dep't of Labor & Indus., 137 Wn. App. 592, 598, 154 P.3d 287 (2007). Accordingly, we interpret a regulation to ascertain and give effect to its underlying policy and intent. Dep't of Licensing v. Cannon, 147 Wn.2d 41, 56, 50 P.3d 627 (2002). We look first to the plain meaning

of the provision to determine that intent. Id. The plain meaning is gleaned from the words of the regulation in the context of the entire statutory scheme. Wash. Cedar, 137 Wn. App. at 599. "Rules and regulations are to be given a rational, sensible interpretation." Cannon, 147 Wn.2d at 57. A regulation is ambiguous if it can reasonably be interpreted in more than one way, but "it is not ambiguous simply because different interpretations are conceivable." Id. at 56.

We interpret a WISHA regulation in light of the WISHA statutes and regulations as a whole, giving meaning to every word in the regulation and attempting to avoid conflicts between different provisions. Wash. Cedar, 137 Wn. App. at 599–600. "We construe WISHA statutes and regulations liberally to achieve their purpose of providing safe working conditions for workers in Washington." Frank Coluccio Constr., 181 Wn. App. at 36; see also RCW 49.17.010. Although we retain the ultimate responsibility for interpreting a regulation, we give substantial weight to an agency's interpretation of the regulations within its area of expertise. Wash. Cedar, 137 Wn. App. at 598. Consequently, we will uphold the agency's interpretation "if it reflects a plausible construction of the statutory language and is not contrary to the legislature's intent and purpose." Id.

The Department bears the burden to prove a WISHA violation. Frank Coluccio Constr., 181 Wn. App. at 36. To establish a serious violation of a WISHA safety regulation, the Department must show that

> "(1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition;

and (5) there is a substantial probability that death or serious physical harm could result from the violative condition."

Id. at 36–37 (quoting Wash. Cedar & Supply Co., Inc. v. Dep't of Labor & Indus., 119 Wn. App. 906, 914, 83 P.3d 1012 (2003)). Bartell argues that the Department failed to prove that the requirements of the standard were not met and that the employees were exposed to a hazard.

II.    Requirements of WAC 296-800-31010

Bartell contends that the Department did not meet its burden to prove that the requirements of WAC 296-800-31010 were violated. The regulation at issue requires that employers maintain exit routes in accordance with certain minimum standards:

> (1) You must make sure each exit route is large enough to accommodate the maximum-permitted occupant load for each floor served by the route.
> (2) You must make sure the capacity of an exit route does not decrease at any point.
> (3) You must make sure the exit route has a minimum ceiling height of 7 feet 6 inches and that no projection from the ceiling is less than 6 feet 8 inches from the floor.
> Objects that stick out into the exit route, such as fans hanging from the ceilings or cabinets on walls, must not reduce the minimum height of the exit route to less than 6 feet 8 inches from the floor.
> (4) You must make sure exit routes are at least 28 inches wide at all points between any handrails.
> (a) If necessary, routes must be wider than 28 inches to accommodate the expected occupant load.
> (b) Make sure objects that stick out into the exit route, such as cabinets on walls, do not reduce the minimum width of the exit route.

WAC 296-800-31010.

The Decision and Order included a finding of fact that, at the time of the inspection, paths to the exits were narrower than 28 inches wide at some points.

Smith's testimony regarding his method of estimating the width of the exit path and photographs showing the writing folder in comparison to the walkway provide substantial evidence for this finding.

We next examine whether this finding supports the conclusions of law that Bartell violated WAC 296-800-31010 and that the CNR was properly issued. Bartell argues that this regulation does not require that all exit routes be 28 inches wide, and therefore the Department did not prove a violation because it did not show that Bartell had any exit routes under 28 inches wide "between any handrails." The Department responds that it and the BIIA reasonably interpreted the WAC to require all exit routes to be at least 28 inches wide at all points, not only between handrails.

The Department's interpretation is a plausible and reasonable reading of the regulation and accords with WISHA's purpose and intent of protecting workers. Although the regulation does not explicitly state the minimum width of an exit path, the 28-inch requirement logically follows from the specified conditions. If an exit route must be at least 28 inches wide at certain points and may not narrow at any point, then the entire route must be at least 28 inches wide at all points.

The federal Occupational Safety and Health Standard analogous to this WISHA regulation further supports the Department's interpretation. State worker safety plans and standards must be "'at least as effective in providing safe and healthful employment and places of employment as the standards promulgated under [the OSH Act] which relate to the same issues.'" SuperValu, Inc. v. Dep't of Labor & Indus., 158 Wn.2d 422, 425, 144 P.3d 1160 (2006) (quoting 29 U.S.C. §

667(c)(2)) (alteration in original). Under the corresponding federal regulation, "[a]n exit route must meet minimum height and width requirements." 29 C.F.R. § 1910.36(g). The regulation specifies that "[a]n exit access must be at least 28 inches (71.1 cm) wide at all points," "[t]he width of an exit route must be sufficient to accommodate the maximum permitted occupant load of each floor served by the exit route," and "[o]bjects that project into the exit route must not reduce the width of the exit route to less than the minimum requirements for exit routes." Id.

The Department's interpretation of the regulation is supported by the plain language of the provision and meets the minimum requirement set out in the federal regulations. Therefore, the BIIA's finding that the exit route was not at least 28 inches at all points supports its conclusion that Bartell did not meet the standard set out in WAC 296-800-31010.

Bartell also contends that the Department failed to make a prima facie case because it presented insufficient evidence that the exit route was not large enough to accommodate the maximum permitted occupancy load. It argues that the Department could not establish this fact because it failed to determine the maximum permitted occupancy load for the floor served by the exit route. The Department responds that proof of a floor's maximum-permitted occupancy load is unnecessary to show a violation when an exit route is too narrow to accommodate even a single occupant.

Again, the Department has the better argument. The regulation states that the exit route must be large enough to accommodate the maximum permitted occupancy load, which may require the route to be wider than 28 inches. WAC

296-800-31010. If the exit route does not meet the minimum allowable width, it necessarily cannot accommodate any non-zero occupancy load. The Department was not required to establish the maximum permitted occupancy load when the route did not meet the minimum requirement.

III.    Exposure to Hazard

Finally, Bartell contends that the Department did not establish that Bartell's employees were exposed to an exit route hazard. The BIIA found that the fact that the exit paths were narrower than 28 inches created "a substantial probability that serious physical harm, such as fractures, a concussion, or death, could result because employees could have trouble exiting and avoiding falling boxes in case of an emergency."

The photographs taken during the inspection showed boxes stacked nearly to the ceiling along the length of the path to the emergency exit in the storeroom. Smith testified that he and Keely could not pass between the stacks at certain points along the exit path without turning sideways. Smith testified that the narrower path could prevent employees from evacuating quickly in the event of an emergency. In the case of a fire, he testified that a blockage in the exit route could result in burns or death. Substantial evidence showed that the narrowness of the exit route could slow or prevent employees from evacuating in the event of an emergency, which could lead to serious harm or death.

The Department is not required to prove actual employee exposure to the hazard. Shimmick Constr. Co., Inc. v. Dep't of Labor & Indus., __ Wn. App. 2d __, 460 P.3d 192, 200 (2020). Rather, the Department must establish that the worker

had access to the violative condition. <u>Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus.</u>, 136 Wn. App. 1, 5, 146 P.3d 1212 (2006). Employees have access when there is a "'reasonable predictability that, in the course of [the workers'] duties, employees will be, are, or have been in the zone of danger.'" <u>Id.</u> (alteration in original) (emphasis omitted) (quoting <u>Adkins v. Aluminum Co. of Am.</u>, 110 Wn.2d 128, 147, 750 P.2d 1257 (1988)).

A standard prohibiting certain conditions presumes that a hazard is present when the standard is not met. <u>Frank Coluccio Constr.</u>, 181 Wn. App. at 41. "Thus, '[a]rguing that a hazard does not exist despite a violation is an impermissible challenge to the wisdom of the standard.'" <u>Id.</u> at 41–42 (alteration in original) (internal quotation marks omitted) (quoting <u>In re Wilder Constr. Co.</u>, No. 06 W1078, 2007 WL 3054874, at *4 (Wash. Bd. of Indus. Ins. Appeals June 15, 2007)).

Because WAC 296-800-31010 sets out a specific safety standard prohibiting exit routes less than 28 inches wide and the Department showed that the requirements of this standard were not met, we presume that a hazard was present. The workers at the store regularly entered the storeroom to access the bathroom, the break room, the management office, and merchandise stored in the area. Therefore, there is a reasonable probability that employees could be in the zone of danger in the course of their duties.

In support of its argument, Bartell primarily argues that the testimony showed that the probability of any harm from the narrow exit route was low because of the availability of other exits and the store manager's lack of concern that the route would suffice in the event of an emergency. However, as stated

above, substantial evidence supported the BIIA's conclusion that the narrowness of the exit route could result in harm or death in an emergency. We cannot accept Bartell's invitation to re-weigh the evidence and redetermine the credibility of witnesses on appeal. See Potelco, 194 Wn. App. at 434.

Substantial evidence supports the finding that the exit route was less than 28 inches, and that finding supports the conclusion of law that the exit route did not meet the requirements of WAC 296-800-31010. Bartell did not meet specific safety requirements of WISHA, and its employees had access to the violative condition. The BIIA did not err in determining that Bartell committed a serious WISHA violation.

Affirmed.

WE CONCUR:

- 11 -