IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| WASHINGTON DEPARTMENT OF LABOR & INDUSTRIES, | ) ) ) | No. 40039-5-III |
| Respondent, | ) ) | |
| v. | ) ) | UNPUBLISHED OPINION |
| INTERNATIONAL LINE BUILDERS, INC., | ) ) ) | |
| Appellant. | ) ) | |

COONEY, J. — International Line Builders, Inc., (ILB) was cited by the

Department of Labor and Industries (Department) after an employee died in an industrial

accident. ILB challenged the citation, which was upheld by the Board of Industrial

Appeals (Board) and, later, by the superior court. On appeal, ILB argues that subsection

(3) of WAC 296-45-52525 provides an exception to subsection (1); that substantial

evidence does not support the Board's decision;[1] and that the Industrial Appeals Judge

---

[1] Throughout its briefing, ILB contends the *Superior Court* erred in affirming the

No. 40039-5-III
*Wash. Dep't of Labor v. Int'l Line Builders*

(IAJ) erroneously excluded testimony at the hearing. We disagree with each of ILB's arguments and affirm the Board's decision.

## BACKGROUND

In December 2019, ILB was tasked with installing power lines[2] over the Columbia River in Benton County, Washington. Avista owned the existing power lines and hired ILB to install the new lines. The new power lines were manufactured by 3M and used carbon cores instead of steel cores.

On December 17, 2019, Cliff Johnson and Derek Schafer, both ILB employees, planned to work in "spacer carts" attached to the new power lines to place spacers along the power lines so "they don't slap together." Clerk's Papers (CP) at 50, 180. Spacer carts are "about four feet by four feet, have little engines in them," and hang "on the wire[s]." CP at 180-81. The spacer carts hung from the new 3M carbon core lines ILB had earlier strung over the Columbia River.

During a pre-work safety meeting, Mr. Schafer and Mr. Johnson discussed their plan for rescue in the event they needed to remove themselves from the carts or "the carts failed." CP at 309. The two also discussed using "fall protection." CP at 309. It was

_____

Board's decision. *See, e.g.*, Br. of Appellant at ii (table of contents). However, we do not review the Superior Court's decision, but instead review the Board's.

[2] Throughout the record, the terms "wire," "cable," "line," "transmission line," "power line," "conductor," and "sub-conductor" are used interchangeably. *See, e.g.*, CP at 267-68, 180, 169, 14, 251.

2

decided Mr. Johnson and Mr. Schafer would tie off to the power lines supporting the spacer carts, as was typical when utilizing the carts. Mr. Johnson and Mr. Schafer wore harnesses that attached to the power lines. Fall protection was used because "carts, you know, they can bounce off, they can—things can happen with your carts. That wire is your anchor point." CP at 310.

Mr. Schafer and Mr. Johnson also discussed wearing personal flotation devices while working over the Columbia River. Mr. Schafer refused to wear a personal flotation device because he felt that they could "get caught on and snagged on" things, creating an "unnecessary hazard." CP at 310. Mr. Johnson also elected not to wear a personal floatation device.

Mr. Johnson and Mr. Schafer began working in their own spacer carts, both supported by a separate set of power lines. While Mr. Johnson was in his spacer cart about 100 feet above the Columbia River, the two power lines supporting his cart and harness broke. Mr. Johnson and his spacer cart fell into the Columbia River. Mr. Johnson died from his injuries.

Following Mr. Johnson's death, George Maxwell, a safety and compliance inspector for the Department, investigated the incident. Mr. Maxwell observed the broken power lines and the spacer cart, still lying in the river. Mr. Maxwell considered power lines breaking to "be a rare event," but he also knew "it was a recognized risk" of working on the power lines. CP at 196.

Mr. Maxwell determined ILB should be cited for violating WAC 296-45-52525(1), because Mr. Schafer and Mr. Johnson did not wear personal flotation devices while working over the river. Mr. Maxwell also determined the violation was "serious" because falling into a river without a personal flotation device "could cause death or serious injury." CP at 209-10.

ILB was issued a citation for violating WAC 296-45-52525(1) and WAC 296-45-345(3). ILB appealed the citations and an "informal/re-assumption conference" was held, and the citations were affirmed. CP at 362. ILB then withdrew its appeal of the citation for violating WAC 296-45-345(3), but appealed the citation for violating WAC 296-45-52525(1).

A hearing on the remaining citation was held before an IAJ. Mr. Maxwell, Mr. Schafer, and Shane Sanchez, a foreman at ILB at the time of the incident, testified at the hearing.

Mr. Maxwell testified consistently with the above summary. He further testified "there's always the risk of" wires failing. CP at 282. But he also stated, "the failure of the subconductors [was] unprecedented in the industry." CP at 268. Mr. Maxwell testified ILB's "safety manual" mandated the use of personal flotation devices when "working over water." CP at 208-09.

Mr. Schafer testified, consistent with the above summary, about the events leading up to, during, and after the power lines broke. Mr. Schafer also began testifying about a

4

conversation he had with Mr. Johnson in which Mr. Johnson relayed information he had heard from Avista and 3M representatives. The Department raised a hearsay objection so the testimony was taken in colloquy. The IAJ ultimately excluded the testimony.

Mr. Sanchez testified that spacer carts "falling was a recognized risk of working on those" power lines. CP at 186. He testified there is "always the possibility of the wire breaking." CP at 186.

Following the hearing, the IAJ issued a "Proposed Decision and Order" affirming the citation. CP at 50-59. ILB appealed the IAJ's decision to the Board. The Board affirmed. ILB then appealed to the Benton County Superior Court where the citation was again affirmed.

ILB timely appeals.

## ANALYSIS

On appeal, ILB argues that subsection (3) of WAC 296-45-52525 provides an exception to subsection (1); that substantial evidence does not support the Board's decision; and that the IAJ erroneously excluded testimony at the hearing. We address each contention in turn.

### WHETHER SUBSECTION (3) OF WAC 296-45-52525 IS AN EXCEPTION TO SUBSECTION (1)

ILB argues WAC 296-45-52525 is ambiguous. ILB contends subsection (3) of WAC 296-45-52525 is an exception to subsection (1). We disagree.

5

We interpret agency regulations as if they were statutes and review them de novo. *Shimmick Constr. Co. v. Dep't of Lab'r & Indus.*, 12 Wn. App. 2d 770, 778, 460 P.3d 192 (2020) (citing *Wash. Cedar & Supply Co. v. Dep't of Lab'r & Indus.*, 119 Wn. App. 906, 913, 83 P.3d 1012 (2004). We construe Washington Industrial Safety and Health Act (WISHA) RCW chapter 49.17 regulations "liberally in order to achieve their purpose of providing safe working conditions for every worker in Washington." *Erection Co. v. Dep't of Lab'r & Indus.*, 160 Wn. App. 194, 202, 248 P.3d 1085 (2011). We give substantial weight to the Department's interpretation of the WISHA. *Wash. Cedar & Supply Co.*, 119 Wn. App. at 913. "[I]f the plain language of the statute exhibits just one meaning, the legislative intent is apparent and we will not construe the statute otherwise." *Union Elevator & Warehouse Co. v. State ex rel. Dep't of Transp.*, 171 Wn.2d 54, 60, 248 P.3d 83 (2011).

WAC 296-45-52525 states:

> **Protection against drowning.** (1) Whenever an employee may be pulled or pushed or may fall into water where the danger of drowning exists, the employee will be provided with and must use U.S. Coast Guard approved personal flotation devices.
> (2) Each personal flotation device must be maintained in safe condition and must be inspected frequently enough to ensure that it does not have rot, mildew, water saturation, or any other condition that could render the device unsuitable for use.
> (3) An employee may cross streams or other bodies of water only if a safe means of passage, such as a bridge, is provided.

ILB argues subsection (3) of the WAC is an exception to subsection (1). It argues the statute is ambiguous while the Department argues the two subsections operate independently. We conclude the regulation is not ambiguous, and the two subsections operate independently.

First, subsection (3) lacks any language that states it is an exception to subsection (1). To find subsection (3) is an exception, we would be required to read language into the statute that we will not do. *Birgen v. Dep't of Labor & Indus.*, 186 Wn. App. 851, 859, 347 P.3d 503 (2015) ("And if a statute is silent on the issue, we generally decline to read into the statute what is not there.").

Second, subsections (1) and (3) operate independently of one another. Subsection (1) is implicated "whenever" an employee is in danger of being pulled, pushed, or falls into a body of water. WAC 296-45-52525(1). In such an event, the employee must be provided with a personal flotation device, even if a safe means of passage is provided, so long as there is a risk the employee may be pulled, pushed, or fall into the water.

Subsection (3) mandates a safe means of passage be provided if an employee has to cross a body of water. WAC 296-45-52525(3). This is not an exception to subsection (1). Instead, subsection (3) operates independently to preclude an employee from crossing a body of water unless a safe means of passage is provided. If a safe means of passage is provided, but there is a still a risk an employee may be pushed, pulled, or fall

7

into a body of water, a personal flotation device must be worn pursuant to subsection (1). The two subsections are not mutually exclusive.

ILB points to Mr. Maxwell's testimony in which he seemingly agreed that subsection (3) of WAC 296-45-52525 was an exception to subsection (1). Mr. Maxwell's interpretation does not drive our analysis. Rather, we interpret the code provisions as if they were statutes and review them de novo. Mr. Maxwell's opinion regarding the code is irrelevant.

The plain language of WAC 296-45-52525 controls because there is only one reasonable interpretation. Accordingly, WAC 296-45-52525 is not ambiguous.

WHETHER THE BOARD'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

ILB argues substantial evidence does not support the Board's conclusion that ILB committed a serious violation of WAC 296-45-52525(1). We disagree.

When analyzing a WISHA appeal, we review the Board's decision based on the record before it. *Erection Co.*, 160 Wn. App. at 201. The Board's findings are conclusive if they are supported by substantial evidence. *Id.* at 202; RCW 49.17.150(1). "Evidence is substantial if it is enough to convince a fair-minded person of the truth of the stated premise." *Shimmick Constr. Co.*, 12 Wn. App. 2d at 778. We will not reweigh the evidence on appeal. *Potelco, Inc. v. Wash. State Dep't of Lab'r & Indus.*, 194 Wn. App. 428, 434, 377 P.3d 251 (2016). We construe the evidence in the light most favorable to the party who prevailed at the administrative hearing; in this instance, the

Department. *Frank Coluccio Constr. Co. v. Dep't of Lab'r & Indus.*, 181 Wn. App. 25, 35, 329 P.3d 91 (2014).

ILB argues the Department failed to establish Mr. Johnson had access or exposure to the violative condition and that it was reasonably predictable its employees would be in the zone of danger or exposed to a drowning hazard. We disagree.

To prove ILB committed a serious violation, the Department must prove:

> (1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known, of the violative condition; and (5) "there is a substantial probability that serious bodily injury or death could result from the violative condition."

*Wash. Cedar & Supply Co.,* 119 Wn. App. at 914 (quoting *D.A. Collins Constr. Co. v. Sec'y of Lab'r*, 117 F.3d 691, 694 (2nd Cir. 1997)).

ILB challenges prongs (1) and (3). As discussed above, WAC 296-45-52525(1) applied because Mr. Johnson was at risk of falling into the Columbia River and drowning while installing spacers on the power lines. Substantial evidence supports prong (1).

As for prong (3), the Department need not prove actual exposure in order to prove a serious violation. *Schimmick Constr. Co.*, 12 Wn. App. at 200. Instead, an employer exposes its employees to a violative condition if they "were exposed to, *or* had access to" it. *Wash. Cedar & Supply Co.*, 119 Wn. App. at 914 (emphasis added). The Department must demonstrate by "*reasonable predictability* that, in the course of [the workers'] duties, employees will be, are, or have been in the zone of danger." *Mid Mountain*

*Contractors, Inc. v. Dep't of Lab'r & Indus.*, 136 Wn. App. 1, 5, 146 P.3d 1212 (2006) (alteration and emphasis in original) (internal quotation marks omitted). The zone of danger is the "'area surrounding the violative condition that presents the danger to employees which the standard is intended to prevent.'" *Schimmick Constr. Co.*, 12 Wn. App. at 200 (quoting *Evergreen Tech, Inc.*, 18 BNA OSHC 1528, 1998 WL 518250, at *7 (No. 98-0348)).

ILB contends findings of fact 7 and 8 are not supported by substantial evidence.[3] CP at 8. Findings of fact 7 and 8 read:

> 7. The possibility of an employee falling from a spacer cart into the water during International Line Builders' work on the project was reasonably foreseeable.
> 8. Mr. Schafer and Mr. Johnson were exposed to the hazard of drowning in the Columbia River if they were to fall.

CP at 8. Both of these findings are supported by substantial evidence. ILB argues it was not reasonably foreseeable that Mr. Johnson would fall into the Columbia River and drown because the power lines breaking was "unprecedented in the industry." Br. of Appellant at 9-10. First, the testimony before the IAJ demonstrated that ILB's own

---

[3] ILB assigns error to the superior court's findings of fact and conclusions of law, but we review the Board's decision, not the Superior Court's. It appears ILB is contesting finding of fact 7 and 8 of the Board's decision, though it repeatedly contends "[t]he *Trial Court* Erred in Concluding that Substantial Evidence Supported the Board's Conclusion that ILB [C]ommitted a Serious Violation." Br. of Appellant at 34, 4 (emphasis added).

"safety manual" mandated the use of personal flotation devices when "working over water." CP at 208-09. In construing this evidence in the light most favorable to the Department, ILB knew it was reasonably foreseeable that an employee could fall into the river while working above it.

Second, Mr. Sanchez, a foreman at ILB at the time of the incident, testified there was always a risk of power lines breaking and spacer carts falling:

> [THE DEPARTMENT:] Couple more questions, Mr. Sanchez. You said that the carts falling into the river or falling was something that was always a possibility, did I hear you correctly?
> [MR. SANCHEZ:] That's correct.
> [THE DEPARTMENT:] So the cart falling was a recognized risk of working on those cables; is that correct?
> [MR. SANCHEZ:] That's correct.
> [THE DEPARTMENT:] I take it that there are a number of risks that you knew about from working on cables like Mr. Johnson was doing, what are some of other risks that were well known by you?
> [MR. SANCHEZ:] There's always the possibility of the wire breaking, there's always a possibility that the hardware at the structure breaks.

CP at 186. Mr. Maxwell also testified "there's always the risk of" wires failing. CP at 282.

Albeit testimony was presented that "the failure of the subconductors [was] unprecedented in the industry," we construe the evidence in the light most favorable to the Department. CP at 268. There was sufficient evidence to convince a fair-minded person that the possibility of an employee falling into the river was reasonably foreseeable. Thus, finding of fact 7 is supported by substantial evidence.

11

As for finding of fact 8, the evidence before the Board was that ILB workers were working "80 to a hundred feet" over the Columbia River in small, "four feet by four feet" spacer carts, suspended by power lines. CP at 205, 180. Employees were actually exposed to the risk of drowning because they were high above the river in tiny carts suspended by power lines that had the potential to break. Further, Mr. Johnson *did* fall into the river. Thus, it is indisputable that employees were exposed to the risk of drowning, a risk that WAC 296-45-52525(1) sought to eliminate. Finding of fact 8 is supported by substantial evidence.

Finally, ILB argues the use of fall protection obviated the need for personal flotation devices. In its reply brief, ILB argues that under WAC 296-800-16070, the hazard of drowning was eliminated because employees utilized fall protection. The code reads, in relevant part:

> **Make sure your employees are protected from drowning.**
> (1) You must provide and make sure your employees wear personal flotation devices (PFD) when they work in areas where the danger of drowning exists, such as:
> (a) On the water.
> (b) Over the water.
> (c) Alongside the water.
> **Note:** Employees are not exposed to the danger of drowning when:
> – Employees are working behind standard height and strength guardrails.
> – Employees are working inside operating cabs or stations that eliminate the possibility of accidentally falling into the water.
> – *Employees are wearing an approved safety belt with a lifeline attached that prevents the possibility of accidentally falling into the water.*

WAC 296-800-16070 (emphasis added).

Here, the possibility of accidentally falling into the water was *not* eliminated by the use of fall protection because Mr. Johnson's "lifeline" was attached to the power lines that ultimately broke. *Id.* The use of fall protection clearly did not prevent the possibility of Mr. Johnson falling into the Columbia River.

ILB also directs us to an Occupational Safety and Health Administration (OSHA) letter of interpretation that discusses the requirements of 29 CFR 1926.106(a). In the letter, OSHA officials stated, "When fall protection is provided . . . and no drowning hazard exists, employees do not need to wear" personal flotation devices. CP at 75. The letter also recognized that fall protection does not always eliminate the risk of drowning. In such cases, where fall protection had not obviated the risk of drowning, the letter stated personal flotation devices must still be worn.

"In interpreting [the] WISHA, we may look to federal decisions that interpret [the] WISHA's federal analogue, the Occupational Safety and Health Act of 1970 (OSHA), but we will not resort to federal case law when Washington law provides controlling precedent." *Schimmick Constr. Co.*, 12 Wn. App. at 197.

As Mr. Maxwell acknowledged before the IAJ, fall protection only eliminates the risk of drowning "if you are tied off to the cable that didn't break." CP at 282. Again, here, employees were tied off to the same power lines that suspended their spacer carts. In the event the power lines failed, the employees would be left with no fall protection.

13

Thus, even if we were to consider the OSHA letter as persuasive, the fall protection used in this case did not eliminate the risk of drowning, and personal flotation devices were still required.

The Board's decision is supported by substantial evidence.

WHETHER THE BOARD ERRONEOUSLY EXCLUDED A PORTION OF MR. SCHAFER'S TESTIMONY

ILB argues the Board abused its discretion when it excluded testimony from Mr. Schafer on the basis of hearsay. The Department responds that the exclusion of Mr. Schafer's testimony was proper and, even if erroneous, exclusion of the testimony was not prejudicial to ILB. We agree with the Department.

We review evidentiary rulings for an abuse of discretion. *King County Pub. Hosp. Dist. No. 2 v. Dep't of Health*, 178 Wn.2d 363, 372, 309 P.3d 416 (2013); *Bayley Constr. v. Dep't of Lab'r & Indus.*, 10 Wn. App. 2d 768, 795, 450 P.3d 647 (2019). Discretion is abused when the decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons. *Bayley Constr.*, 10 Wn. App. 2d at 795-96.

ER 801(c) reads: "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible, subject to some exceptions. *See* ER 802-807.

14

Here, ILB sought to introduce testimony from Mr. Schafer about his "conversations with [Mr. Johnson]." CP at 304. After the Department raised a hearsay objection, Mr. Schafer's testimony was taken in colloquy. Mr. Schafer's conversation with Mr. Johnson included information Mr. Johnson had heard from Avista and 3M representatives:

> [Mr. Schafer:] Yes. So my conversations with [Mr. Johnson], he was going to ask Avista. And my understanding, Avista forwarded it to 3M because this was a new wire to them as well, so they wanted to go with the manufacturer. So to my understanding, because [Mr.] Johnson had shared with me, we needed to get measurements of the wheels of the cart, this is information 3M wanted, they wanted measurements.
> . . . .
> And then he shared with me that were—we were good to use the cart based on 3M's recommendations. Not recommendations, but based on all the statistics we gave them, the specifications that 3M authorized us to use carts on the wire.

CP at 305-06. The IAJ did not immediately rule on the Department's hearsay objection. Rather, in an addendum to the IAJ's "Proposed Decision and Order," the IAJ sustained the Department's objection stating, "the testimony taken in colloquy . . . remains in colloquy and is not admitted into the record." CP at 59. The Board affirmed the IAJ's decision and their evidentiary rulings.

ILB argues it was not seeking to admit Mr. Schafer's conversations with Mr. Johnson to prove the truth of the statement, but to instead "demonstrate the understanding and mindset of the foremen as they discussed whether [personal flotation

15

devices] were necessary and whether the spacer carts were a safe means of passage."
Br. of Appellant at 32.

The IAJ and the Board did not abuse their discretion when they excluded Mr. Schafer's testimony. First, the statements ILB sought to admit were double hearsay. Mr. Johnson's statements to Mr. Schafer were statements made by 3M and Avista representatives to Mr. Johnson. Second, the statements *were* offered to prove the truth of the matter asserted. ILB sought to introduce testimony from Mr. Schafer to show the spacer carts were a safe means of passage and that the new wires used could safely suspend the carts. Third, ILB attempts to argue the statements simply went to Mr. Schafer's and Mr. Johnson's state of mind. However, their state of mind was irrelevant. Regardless of what Mr. Johnson, Mr. Schafer, or 3M and Avista representatives thought about the power lines and spacer carts being a safe means of passage, the employees were still required to wear personal floatation devices because of the risk of falling into the river.

Finally, even if it was an abuse of discretion to exclude Mr. Schafer's testimony, ILB cannot show prejudice. ILB argues Mr. Johnson's "state of mind regarding hazards as well as mitigation and elimination of hazards is relevant to the ultimate issue in this matter." Br. of Appellant at 34. But, as explained above, whether Mr. Johnson and Mr. Schafer thought the wires and spacer carts were safe is irrelevant. Hanging 100 feet

over the Columbia River in a small spacer cart presented a risk that employees could be pulled, pushed, or fall into the water and drown.

The Board did not err when it excluded testimony offered by Mr. Schafer about a conversation he had with Mr. Johnson.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Lawrence-Berrey, C.J.

_____
Pennell, J.