[No. 62264-1-I.   Division One.   June 8, 2009.]

ORCA LOGISTICS, INC., *Respondent*, v. THE DEPARTMENT OF LABOR AND INDUSTRIES, *Appellant*.

---

458

*Robert M. McKenna, Attorney General,* and *Anastasia R. Sandstrom, Assistant,* for appellant.

*Paul A. Wallstrom* (of *Paul Arnold Wallstrom*), for respondent.

¶1 AGID, J. — Madsen Trucking owed the Department of Labor and Industries (L&I) premiums for its workers' compensation coverage when it went out of business with assets consisting of four working trucks, four trailers, two damaged trucks, $60,000 in accounts receivable, three or four employees, and a customer list. Madsen Trucking directly and indirectly conveyed the trucking equipment to Orca Logistics, Inc., a trucking company that formed as Madsen

Trucking was closing. Madsen Trucking's owner went to work as Orca's manager, bringing most of the remaining employees with him in addition to the customer that provided 77 percent of Madsen Trucking's 2004 income. Because this evidence supports the Board of Industrial Insurance Appeals' (Board) finding that Madsen Trucking conveyed a major part of its assets to Orca, we affirm the Board's order requiring Orca, Madsen Trucking's successor, to pay the premiums owed.

## FACTS

¶2 Erik Madsen started Madsen Trucking in 1992. He formed the company to transport goods and products around the nation. Madsen began shutting his company down in late 2004 after experiencing "severe financial difficulties." By the time Madsen finished closing Madsen Trucking in early 2005, the company owed L&I insurance premiums for its workers' compensation coverage. Orca incorporated in December 2004 for the purpose of engaging in transportation, warehousing, logistics, and transloading. At its "Initial Shareholders' and Directors' Consent to Corporate Action in Lieu of Organizational Meeting," Orca passed a resolution stating that "it is to the advantage of this corporation to secure the services of Erik Madsen as manager of this corporation for a minimum period of three years." Madsen signed an employment contract with Orca in December 2004 and started work in early 2005.

¶3 When it shut down, Madsen Trucking had four working trucks, two damaged trucks, and four trailers. The trucking equipment was a key part of Madsen's business. Besides the trucking equipment and about $60,000 due for accounts receivable, Madsen Trucking had few other tangible assets by the time it closed. The company owed money on the trucks, and Madsen worked hard to avoid a default on his equipment. He applied the $10,000 insurance settlement that Madsen Trucking received for the damaged

trucks to the amount due on the remaining trucks.[1] Orca leased the four trucks and four trailers from February 2005 to October 2005 under a lease-to-own arrangement. Leasing the trucks was "necessary for the continued operation and success" of Orca. In October 2005, Orca bought the trucks and trailers from Madsen Trucking for the amount Madsen Trucking owed its lender for the equipment.

¶4 Brent Redmond Logistics, Inc., was Madsen Trucking's largest customer and accounted for $714,000 of Madsen Trucking's $926,000 income in 2004.[2] Brent Redmond Logistics did business with Orca after Madsen Trucking closed. Madsen Trucking had 130 customers in 2004, 19 of which, including Brent Redmond Logistics, transferred their business to Orca. Madsen Trucking had 12 employees in the year before it shut down. By December 2004, Madsen Trucking had only three or four employees. After Madsen Trucking shut down, three of its employees, including Madsen, went to work for Orca.

¶5 L&I determined that Orca qualified as Madsen Trucking's successor under RCW 51.08.177 and was therefore liable for Madsen Trucking's unpaid premiums under RCW 51.16.200. Orca appealed the notice of assessment to the Board. The Board found that Orca was a successor to Madsen Trucking as shown by the "sale or transfer of four trucks, four trailers, common business purpose, four former employees to include Mr. Madsen in the operation of Orca Logistics, Inc., several former customers doing business, to include Brent Redmond Logistics, . . . which was Madsen's largest customer by dollar volume, and the same corporate

---

[1] Madsen told the L&I auditor that he applied the $60,000 collected from accounts receivable to pay down the amount owed on the trucks. But he later testified that he only applied a small amount of the accounts receivable payments to the debt on the trucks. The Board resolved the conflicting testimony by finding that Madsen retained the $60,000 to retire other debts. Although a reasonable trier of fact could have reached a different conclusion, the evidence also supports the Board's finding, and we will not disturb that finding under substantial evidence review.

[2] Seven hundred fourteen thousand dollars ($714,000) equals 77 percent of Madsen Trucking's 2004 income.

attorney."[3] The Board denied Orca's petition for review. Orca appealed the Board's decision to the superior court, which reversed the Board and vacated the notice of assessment.[4] The State appeals, arguing that substantial evidence supports the Board's order that Orca pay Madsen Trucking's back taxes.

## DISCUSSION

¶6 The judicial review provisions of the Administrative Procedure Act (APA), chapter 34.05 RCW, govern our review of the Board's order.[5] Under the APA, Orca bears the burden of proving the invalidity of the Board's order.[6] This court will grant relief if the Board's order is not supported by substantial evidence based on the record before the Board.[7] "Substantial evidence" is evidence sufficient to persuade a fair-minded person of the truth or correctness of the matter.[8] We view the evidence and its reasonable inferences in the light most favorable to the prevailing party—here, L&I—in the highest forum that

[3] In addition to determining that Orca was a successor, the Board also ordered L&I to recalculate the premiums owed by Madsen Trucking and issued a revised notice of assessment. Neither party challenges the recalculation.

[4] The superior court found that a majority of Madsen Trucking's customers, both by dollar value and number, did not transfer their business to Orca, that the majority of Madsen Trucking's employees did not go to work for Orca, and that the majority of Madsen Trucking's assets were not transferred to Orca.

[5] RCW 51.48.131; *R&G Probst v. Dep't of Labor & Indus.*, 121 Wn. App. 288, 293, 88 P.3d 413, *review denied*, 152 Wn.2d 1034 (2004). In reviewing administrative action, we sit in the same position as the superior court, applying the standards of the APA directly to the record before the agency. *Tapper v. Employment Sec. Dep't*, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).

[6] RCW 34.05.570(1)(a) ("The burden of demonstrating the invalidity of agency action is on the party asserting invalidity.").

[7] RCW 34.05.570(3) ("The court shall grant relief from an agency order in an adjudicative proceeding only if it determines that . . . (e) [t]he order is not supported by evidence that is substantial when viewed in light of the whole record before the court."). The superior court's findings of fact are not relevant. *Postema v. Pollution Control Hearings Bd.*, 142 Wn.2d 68, 100 n.11, 11 P.3d 726 (2000) ("Unless the superior court takes new evidence under RCW 34.05.562, its findings are not relevant in appellate review of an agency action.").

[8] *R&G Probst*, 121 Wn. App. at 293.

exercised fact-finding authority—here, the Board.[9] We will also grant relief from the Board's order if it erroneously interpreted or applied the law.[10]

¶7 RCW 51.16.200 makes successors liable for the unpaid taxes of the business they succeed.[11] RCW 51.08.177 defines "successor" as "any person to whom a taxpayer quitting, selling out, exchanging, or disposing of a business sells or otherwise conveys, directly or indirectly, in bulk and not in the ordinary course of the taxpayer's business, a major part of the property, whether real or personal, tangible or intangible, of the taxpayer." WAC 296-17-31030(1) defines "major part" as "a significant or substantial portion of a business's property."[12] "Significant" means "having or likely to have influence or effect."[13] "Substantial" means "being that specified to a large degree or in the main."[14] Accordingly, selling or conveying a significant or substantial

---

[9] *Johnson v. Dep't of Health*, 133 Wn. App. 403, 411, 136 P.3d 760 (2006).

[10] RCW 34.05.570(3)(d).

[11] RCW 51.16.200 provides, in part, that

[w]henever any employer quits business, or sells out, exchanges, or otherwise disposes of the employer's business or stock of goods, any tax payable hereunder shall become immediately due and payable, and the employer shall, within ten days thereafter, make a return and pay the tax due; and any person who becomes a successor to such business shall become liable for the full amount of the tax and withhold from the purchase price a sum sufficient to pay any tax due from the employer.

[12] WAC 296-17-31030(1) also declares that "[m]ajor does not mean more than half." Because we are not dealing with a case where a dissolving company transferred less than half of its assets to its successor, we do not rely on the last sentence of WAC 296-17-31030(1). Additionally, we note that this regulation is inconsistent with the statutory definition of "successor" for the purposes of making successors liable for unpaid excise taxes. *See* RCW 82.04.180(1) (" 'Successor' means: (a) Any person to whom a taxpayer quitting, selling out, exchanging, or disposing of a business sells or otherwise conveys, directly or indirectly, in bulk and not in the course of the taxpayer's business, more than fifty percent of the fair market value of either the (i) tangible assets or (ii) intangible assets of the taxpayer.").

[13] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2116 (1993).

[14] WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2280.

portion of the closing business's property to another business triggers successor liability.[15]

¶8 The legislature amended RCW 51.08.177 in 2004.[16] The clause in the statute describing the type of property that triggers successor liability when conveyed previously read, "a major part of the materials, supplies, merchandise, inventory, fixtures, or equipment of the taxpayer."[17] As compared to the predecessor statute, the current language clarifies that intangible assets may also be considered a major part of a business that is shutting down. WAC 296-17-31030(3) defines "intangible property" as "property that has no physical existence, but may have value" and names goodwill and customer lists as examples of intangible property.[18]

¶9 Here, the Board correctly focused its review of L&I's assessment on whether Madsen Trucking conveyed a major part of its tangible and intangible property to Orca. We review the Board's decision to determine whether the evidence was sufficient to persuade a fair-minded person that Madsen Trucking conveyed a significant or substantial portion of its property to Orca. By the time it closed, Madsen Trucking's tangible and intangible property consisted of four working trucks; two nonworking trucks; four trailers; $60,000 in accounts receivable; four employees, including an experienced manager; and a customer list.[19] Madsen Trucking was engaged in the trucking business. Having working trucks and trailers is an integral part of

---

[15] RCW 51.08.177; RCW 51.16.200; WAC 296-17-31030(1).

[16] LAWS OF 2004, ch. 243, § 1.

[17] Former RCW 51.08.177 (2002).

[18] WAC 296-17-31030(3) states that the most common example of intangible property is goodwill. "Goodwill is the value of a trade or business based on expected continued costumer patronage due to its name, reputation, or any other factor. Other examples of intangible property include . . . customer lists." WAC 296-17-31030(3).

[19] The evidence does not support the Board's finding that Madsen Trucking's assets included three forklifts, a warehouse floor scrubber, dock plates, a straight truck, a fueling truck, a yard goat, a super chassis, and four additional trailers. Madsen testified that Orca owned this equipment.

that business. The evidence supports the Board's finding that Madsen Trucking conveyed all of its working trucks and trailers to Orca.[20]

¶10 Orca claims that the working trucks and trailers were valueless to Madsen Trucking because it did not own them outright. Thus, Orca contends that L&I did not lose anything when Madsen conveyed the trucking equipment because L&I could not have made a claim to those assets. But whether L&I could have collected a debt from Madsen is not relevant to the statutory scheme.[21] Rather than focusing on what might have happened to Madsen Trucking's assets, L&I must determine who got the major part of the business that owed the premiums. Nor were the trucks and trailers valueless. They allowed Madsen Trucking to engage in trucking, through which it earned $926,000 in 2004 income. And the evidence before the Board showed that Orca paid the balance due on the trucks, relieving Madsen Trucking of a debt.

¶11 The evidence also shows that Madsen Trucking conveyed some of its nontangible property, its goodwill and customer lists, to Orca. Nineteen of Madsen Trucking's customers, including Brent Redmond Logistics, continued to patronize the successor company when Madsen and two of his remaining three employees transferred to Orca.[22] On the basis of this evidence, a reasonable trier of fact could have determined that the tangible and nontangible property Madsen Trucking conveyed to Orca comprised a major part of Madsen Trucking's assets. Substantial evidence supports the Board's conclusion that Orca succeeded Madsen Trucking.

---

[20] Additionally, Madsen Trucking applied the insurance settlement for the damaged trucks toward the amount due on the working trucks. Because Madsen Trucking conveyed the working trucks to Orca in exchange for Orca's paying the amount due on those trucks, the evidence shows that Madsen Trucking indirectly conveyed the damaged trucks to Orca by reducing the liability that Orca assumed.

[21] RCW 51.08.177; RCW 51.16.200.

[22] Personnel qualify as an intangible asset. *In re Estate of Glant*, 57 Wn.2d 309, 312, 356 P.2d 707 (1960).

466

¶12 We reverse the superior court's August 21, 2008 order vacating the notice of assessment against Orca and affirm the Board's December 17, 2007 order.

GROSSE and COX, JJ., concur.