

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| HALME CONSTRUCTION, INC., | ) | |
| | ) | No. 38062-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON DEPARTMENT OF | ) | UNPUBLISHED OPINION |
| LABOR & INDUSTRIES, | ) | |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — The Department of Labor and Industries (Department) appeals a superior court order reversing a decision of the Board of Industrial Insurance Appeals (Board). Relying on a Department compliance officer's testimony about the excessive steepness of excavation sloping he observed at a Halme Construction, Inc. worksite and related photographs, the Board had affirmed Halme's citation for failing to protect employees from possible cave-ins.

Halme asks us to reassess credibility, reweigh evidence, and accept its argument that the Department's failure to perform a simple and safe measurement and calculation renders other evidence insubstantial. We disagree, reverse the trial court, and reinstate the citation.

FACTS AND PROCEDURAL HISTORY

On July 16, 2018, Halme Construction, Inc. was conducting a trenching operation for the purpose of installing piping in downtown Spokane. The Department received a referral from the attorney general's office about Halme's activities. The referral included video of the work site that depicted a trench and an individual moving a grade stick from within the trench. Halme later stipulated that one of its employees, Joey Gonzalez, was working in the trench at the time.

Upon receiving the referral, the Department sent Creston Grant, a compliance safety and health officer, to inspect. Although Mr. Grant testified that the Department received the referral at 11:02 a.m. and he had arrived at the site by 12:25 p.m., Halme employees would later testify that by the time of Mr. Grant's arrival, they had commenced a backfill operation. No employees were in the trench when Mr. Grant arrived.

During his site visit, Mr. Grant spoke with project superintendent Dwight Heidegger and two other Halme employees. He also conducted a walk-around inspection of the site that he estimated took about an hour. He took over two dozen photographs.

Chapter 296-155 of the Washington Administrative Code (WAC) provides safety standards for construction work. Part N of the chapter, WAC 296-155-650 through -66411, deals with excavation, trenching and shoring. Except in circumstances not present here, WAC 296-155-657(1)(a)[1] provides that employers must "protect each employee in an excavation from cave-ins by an adequate protective system." The protective system must be designed in accordance with the Part N regulations and appendices. Appendix A, which can be found at WAC 296-155-66401, provides a system under which the soil being excavated must be classified. It is undisputed that the type of soil in the area of the Halme's trench was type C soil, which is a "less cohesive soil . . . more granule, [and] similar to a sand." Administrative Record (AR) at 147; WAC 296-155-66401(2) (defining type C soil). Appendix B, which can be found at WAC 296-155-66403, contains the specifications for required sloping and benching protective systems, depending on the classification of the soil.

Halme was relying on a trench box and sloping as its protective system for the trenching operation. When a trench box is used as a protective system, its sides must extend to a height at least 18 inches above the top of the vertical side of the excavation (freeboard). *E.g.*, Figure N-12, WAC 296-155-66403. The slopes above freeboard must

---

[1] The regulation does not apply if the excavation is made entirely in stable rock, or in excavations of less than four feet in depth where an "examination of the ground by a competent person provides no indication of a potential cave-in." WAC 296-155-657(1)(a)(i), (ii).

be equal to or less steep than the maximum allowable slope for the soil, which, in the

case of type C soil, is 1½ : 1; in other words, the slopes must cover one and a half feet of

horizontal distance for every foot of vertical rise. This is approximately a 34-degree

angle. The regulatory diagram for this type of protective system in type C soil is

provided by figure N-12 of appendix B:



**Figure N-12
Slope
Configurations
for Type C Soil
Support or Shield System**

**Vertically Sided Lower Portion**

All excavations 20 feet or less in depth which have vertically
sided lower portions must be shielded or supported to a
height at least 18 inches above the top of the vertical side. All
such excavations must have a maximum allowable slope of 1
1/2:1. All other simple slope, compound slope and vertically
sided lower portion excavations must be in accordance with
options permitted under RCW WAC 296-155-657(2).

Mr. Grant cited Halme for four violations following his site visit. The first,

citation item 1-1, was for violating the requirement to have an adequate protective system

in place; he found the slopes to be steeper than the maximum permitted. Another,

citation item 1-4, was that Halme did not have a competent person at the work site

conducting daily inspections of its protective systems. Two others, citation items 1-2 and

1-3, were that Halme did not have a safe means of access and egress to its trench, and that materials (spoils piles) were placed at the edge of the excavation, rather than two feet back as required.

Halme informally challenged all the citations. It pointed out with respect to citation items 1-2 and 1-3 that by the time Mr. Grant arrived at the work site, its employees had begun a backfill operation. As a result, it had removed ladders and no employee was in the trench. Based on that information, the Department reassumed jurisdiction and issued a corrective notice that vacated those two citations. The Department affirmed citations for items 1-1 and 1-4, concluding that the elements necessary to establish those violations had been documented and supported.

*Formal appeal, hearing, and proposed decision of the IAJ*

Halme again appealed, and a hearing was conducted before an industrial appeals judge (IAJ). The Department called as its sole witness Mr. Grant, and Halme called as its sole witness Mr. Heidegger. Three exhibits were admitted. Exhibit 1 consisted of 27 color photographs taken of the work site during Mr. Grant's site visit. Exhibit 2 consisted of 13 still pictures obtained from the video provided by the attorney general's office. Exhibit 3 reproduced several excavation configurations from appendix B, including figure N-12, which we reproduce above.

Mr. Grant admitted during the hearing that the citation for not having a competent person present daily might have been based on his misunderstanding of something Mr.

Heidegger said to him during the site visit. Mr. Heidegger testified he *had* been misunderstood, and that Halme was aware of and had complied with the requirement to have a competent person present daily. The IAJ accepted Halme's evidence and vacated that citation. She affirmed the citation for a serious violation of WAC 296-155-657(1)(a), with a penalty of $1,800.

*Board review and decision*

Halme appealed the IAJ's decision to the Board. While the Board agreed with the IAJ's ultimate conclusions, it granted review because it found her findings to be insufficient. It affirmed the citation of item 1-4 as modified.

The Board's final decision and order observed that it was uncontested that the Halme excavation was not made in stable rock and that the trench was more than 4 feet in depth. It observed that no evidence conflicted with Mr. Grant's assessment that the soil was type C.

Mr. Grant's testimony at the hearing before the IAJ was that the trench was 14 feet, 8 inches deep, based on the setting on a grade stick he had observed lying near the trench. Mr. Grant testified that he had not taken measurements of his own because, "as a safety inspector, I cannot put myself in a position where I would be exposed to the same potential hazards that the employee would be exposed to." AR at 115.

Halme challenged Mr. Grant's inference from the grade stick during the hearing, and in cross-examination, Mr. Grant conceded that the grade stick setting might have to

6

be adjusted for the elevation of the laser it was set to detect.  Halme offered no evidence

of the depth of the trench.

On the matter of the trench's depth, the Board's decision observed:

> While the precise depth of the trench was not measured, the numerous photographic exhibits clearly establish that the trench was close to the 14 plus feet indicated by Mr. Grant.  Halme had placed a trench shoring box in the trench.  The trench shoring box was, itself, 8 feet deep. The distance between the street surface, as shown in the photographic exhibits, and the top of the trench shoring box is very nearly that much distance again.

Clerk's Papers (CP) at 3.

The Board found that "[g]iven the depth of the trench and the soil type, employees

working inside the trench shoring box were at risk to be engulfed by unstable soil

sloughing or caving into the trench shoring box from the surrounding higher portions of

the excavation.  Under these conditions Halme was required to provide additional safety

measures to protect its workers." *Id.*

The Board noted that Mr. Grant had testified that the higher sides of the

excavation did not meet the amount of slope required by the Department's regulations.  It

described the following photograph—the first photograph in exhibit 1, AR at 161,—as

"giv[ing] credibility to Mr. Grant's conclusion that the excavation was not properly

sloped to a ratio of one and a half to one." *Id.*

7

No. 38062-9-III
*Halme Constr. v. Dep't of Labor & Indus.*



The Board also observed that "[t]he photograph shows excavation debris placed immediately next to the excavation, thus making the total depth to the top of the trench shoring box even higher than the surrounding street surface." CP at 3-4.

The Board observed that the second and third photographs in exhibit 1 "show what appears to be a sewer access point or vault to one side of the trench," and, "[t]he slope on that side of the trench, closest to the trench shoring box, is clearly steeper than the opposite side of the trench." CP at 4.

It held that "[t]hese evidentiary exhibits support Mr. Grant's opinion that the excavation was not properly sloped to prevent workers from exposure to cave in or sloughing of surrounding Type C soil." *Id.* The second and third photographs in exhibit 1, AR at 162-63, are reproduced to the right and below.



9



Halme timely appealed the Board's decision to superior court. It contended the Board's findings were not supported by substantial evidence, arguing that "[t]he slope of the trench . . . was never measured or otherwise calculated" and that the Department "easily and safely could have done so during the inspection." CP at 10-11. It argued that the finding that the slope was too steep was based on "a brand new inspector's subjective

'belief,'" with the result that there was a "complete lack of objective evidence." CP at 11.

The superior court reversed the Board and vacated citation item 1-1. The Department appeals.

ANALYSIS

The Department appeals the superior court's reversal, arguing that the court improperly substituted its judgment for the Board's under substantial evidence review.

A prima facie case of a serious violation of a regulation adopted under the Washington Industrial Safety and Health Act, chapter 49.17 RCW (WISHA), requires the Department to prove that (1) the cited standard applies; (2) the requirements of the standard were not met; (3) employees were exposed to, or had access to, the violative condition; (4) the employer knew or, through the exercise of reasonable diligence, could have known of the violative condition; and (5) "'there is a substantial probability that death or serious physical harm could result'" from the violative condition. *J.E. Dunn Nw., Inc. v. Dep't of Labor & Indus.*, 139 Wn. App. 35, 44-45, 156 P.3d 250 (2007) (quoting *Wash. Cedar & Supply Co. v. Dep't of Labor & Indus.*, 119 Wn. App. 906, 914, 83 P.3d 1012 (2004)).

In the event of a petition for review of an order of the Board, the findings of the Board with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive. RCW 49.17.150(1). Evidence is substantial

when it would persuade a fair-minded person of the truth or correctness of the matter.
*Erection Co., Inc. v. Dep't of Labor & Indus.*, 160 Wn. App. 194, 202, 248 P.3d 1085
(2011); *Frank Coluccio Constr. Co. v. Dep't of Labor & Indus.*, 181 Wn. App. 25, 35,
329 P.3d 91 (2014).

This court reviews a decision by the Board directly, based on the record before the
agency. *Legacy Roofing, Inc. v. Dep't of Labor & Indus.*, 129 Wn. App. 356, 363, 119
P.3d 366 (2005). We do not reweigh evidence or revisit credibility determinations.
*Ostrom Mushroom Farm Co. v. Dep't of Labor & Indus.*, 13 Wn. App. 2d 262, 271, 463
P.3d 149 (2020); *Potelco, Inc. v. Dep't of Labor & Indus.*, 7 Wn. App. 2d 236, 243, 433
P.3d 513 (2018). We review the evidence and its reasonable inferences in the light most
favorable to the prevailing party—here, the Department—in the highest forum that
exercised fact-finding authority—here, the Board. *Erection Co.*, 160 Wn. App. at 202;
*see, e.g.*, *Orca Logistics, Inc. v. Dep't of Labor & Indus.*, 152 Wn. App. 457, 462-63, 216
P.3d 412 (2009). Unchallenged findings of fact are verities on appeal. *Frank Coluccio
Constr.*, 181 Wn. App. at 35.

Evidence before the Board included Mr. Grant's testimony that he spent
approximately an hour inspecting the work site and taking pictures. Based on his visual
inspection alone, he believed that the sides of the excavation were steeper than the
maximum permitted slope. He also explained that a common rule of thumb used by
Department inspectors is that if a slope on the side of a trench complies with a one and a

half to one ratio, then a person should be able to walk up and out without using his or her hands. He testified he could see that would not be possible with slopes on the jobsite. Evidence before the Board also included the 27 pictures taken at the jobsite, including the 3 commented on by the Board's decision that we reproduce above.

Halme's contention that this is not substantial evidence is based on its argument that WISHA regulations provide a simple formula, measurements for which can be safely taken, that determine compliance. It argues that the failure to take those measurements and do that math is enough, on its own, to make it unreasonable for the Board to have relied on Mr. Grant's testimony and photographs. For reasons set forth below, we disagree.

*The relevant regulation does not provide a formula*

Halme argues that "[t]he regulation at issue provides a simple method to calculate the angle of a trench for purposes of determining whether a trench is properly sloped," citing WAC 296-155-66403 (Figure N-12). Resp't's Resp. Br. at 12. The formula, Halme argues, required Mr. Grant to "simply measure[ ] the total distance across the trench[,] . . . divide[ ] the distance by two, and deduct[ ] the width of the trench box," thereby "easily determin[ing]" whether the horizontal distance was 1.5 the relevant depth. *Id.* at 14-15.

Before the Board, Halme did not argue that WISHA regulations provide such a formula or require that the Department use it. Under RCW 49.17.150(1), "[n]o objection

that has not been urged before the board shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." In any event, the relevant regulatory diagram and language is set forth in its entirety at page four, above. Halme's proposed formula does not appear in the regulation.

> *The formula proposed by Halme can arrive, at best, at an average slope of the sides of an excavation*

Halme contends that sloping must be compliant if the following formula is satisfied:

*Excavation width ≥ 2 x (1.5 x depth of excavation) + width of trench box.*

*See* Resp't's Resp. Br. at 14-15. This assumes, however, that the slopes on either side of the trench box are identical and even, rather than irregular. Only then will this calculation of what is an "average" slope conform to the actual slopes on either side. If the trench box is not centrally located and the slopes on either side are not identical, Halme's formula tells us nothing about their actual slope.[2]

---

[2] Assuming a total depth of 14' 8" and a trench box width of 4', the relevant vertical distance would be 98" (6' 8" plus 18") and what Halme contends is the "compliant" excavation width would be 28' 6" (342"). This supposedly "compliant" width could be achieved with either of the following slope combinations, and many others:

Identical slopes on either side, with a horizontal base of 147" and a height of 98", each having an H/V ratio of 1½ to 1, and 34-degree slopes; or

A near slope having a horizontal base of 98" and a height of 98", and a far slope having a horizontal base of 196" and a height of 98", having H/V ratios of roughly 1 to 1 and 2 to 1, respectively, or 45 degrees and approximately 27 degrees. Obviously, the near slope in this example would not be compliant.

Mr. Grant's photographs establish that the slopes on either side of Halme's excavation are not identical and regular. The Board even commented on the fact that the slope on the side of the trench in which there appears to be a sewer access point "is clearly steeper than the opposite side of the trench." CP at 4. The formula is not a test for compliance.

*The record does not support Halme's claim that Mr. Grant could have safely taken useful measurements*

The record does not support Halme's claim that Mr. Grant could have safely and accurately made useful measurements. Mr. Grant repeatedly testified that this was not the case. *See* AR at 115 ("I cannot put myself in a position where I would be exposed to the same potential hazards that the employee would be exposed to, so that's why I can't take measurements or get any closer to that trench"), 132 (same), 134 (could not measure from the top of the trench box because "I can't put myself in a position . . . exposed to a cave-in hazard"). He also testified that a calculation based on the depth of the trench would not change the fact that portions of the excavation walls were visibly too steep.[3]

---

[3] In cross-examining Mr. Grant, Halme sought his agreement that areas of steepness could be "more vertical" as long as compensating areas of less steepness kept the slope below a hypothetical straight 34-degree line running from freeboard to ground level. AR at 136-42. Mr. Grant responded that this would be a form of benching which is not permitted with type C soil. *See* WAC 296-155-66403. Even in type B soil, which can be benched, the maximum vertical dimension is four feet. *See id.* Neither the IAJ nor the Board accepted that construction of figure N-12, and that particular argument is not renewed on appeal.

First, it is undisputed, and the pictures make clear, that at the time Mr. Grant arrived at the jobsite, Halme employees had moved soil (presumably type C soil) to the edges of the excavation. Indeed, the reason Halme was able to obtain reversal of citation items 1-2 and 1-3 was because it established to the Department's satisfaction that it had removed its ladders and moved piles of material to the excavation's edges in the beginnings of a backfill operation. Under WISHA regulations, neither Halme employees nor Mr. Grant should have been entering the excavation or standing on the piles of material at its perimeter.

It is hard to imagine how useful measurements could safely and reliably been made. For instance, the slope on either side of the trench box was required to begin at or below the 18 inch freeboard at the top of the box. Mr. Grant could not enter the trench to take a measurement; he would have to rely on what he could see or photograph. He would be doing that from a location 8 feet higher in elevation than the top of the trench box and likely 12 feet, or more or less, from its side.

Since Mr. Grant suspected particular areas of slope were too steep, the most meaningful horizontal measurement would be for him to stand at the edge above the slope he believed was too steep and attempt to measure the distance to the near side of the trench box—not all the way across the excavation, as suggested by Halme. But here

16

again, no one could enter the trench to assist him, and the near side of the shoring box was 8 vertical feet, and 12 horizontal feet (more or less) away.

*We decline Halme's invitation to reassess credibility and reweigh evidence*

Halme leads its argument on appeal by emphasizing the words "*when viewed in light of the record as a whole*" in RCW 49.17.150(1)'s provision that "[t]he findings of the board . . . with respect to questions of fact, if supported by substantial evidence on the record considered as a whole, shall be conclusive." If Halme reads "considered as a whole" to be an invitation to reargue the Board's assessment of witness credibility and evidentiary weight, it is mistaken.

Viewing the evidence in the light most favorable to the Department, Mr. Grant testified to having spent approximately an hour doing a walk-around of the jobsite. He would have had the opportunity to view the walls of the excavation from many angles. He testified to having received nine weeks' training in Olympia when hired, and field training from supervisors or veteran compliance officers thereafter. More important for purposes of his ability to estimate slope, however, was his human experience. We are constantly exposed to the appearance and properties of inclines. If an adult who understands the concept of a geometric angle and how it is measured was given several minutes to examine and estimate the degree of an acute angle rising from a horizontal

line, it would be the rare individual who would not be able to say whether the angle was less than, more than, or close to 45 degrees. Board members could reasonably perceive some of the slopes in the photographs as being greater than 45 degrees, and even near-vertical.

It is commonly understood that lay witnesses may estimate size, weight, distance, speed and time even when those quantities could be measured precisely. *Strong v. Valdez Fine Foods*, 724 F.3d 1042, 1046 (9th Cir. 2013) (citing 7 JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 1977 (rev. ed. 1978)). In Washington, lay witnesses may give opinions or inference based on rational perceptions that help the fact finder understand the witness's testimony. ER 701; *State v. Montgomery*, 163 Wn.2d 577, 591, 183 P.3d 267 (2008). In *Strong*, the Ninth Circuit reversed a district court's refusal to consider a plaintiff's testimony that an access ramp's slope exceeded the two percent permitted by the Americans with Disabilities Act, because it was not based on measurements. The Court held that the plaintiff's life experience using such ramps was a sufficient basis for his lay opinion testimony.

The Board found Mr. Grant's photographs to lend support to his testimony. A photograph is regarded as authenticated if a witness can testify that it is a reasonably accurate portrayal of the subject depicted. *State v. Sapp*, 182 Wn. App. 910, 916-17, 332

18

P.3d 1058 (2014). The photographic evidence included in exhibits 1 and 2 was admitted without objection. After a photograph has been admitted, the opponent "may, of course, attempt to show its flaws, inaccuracies, or alteration." 5C KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 901.21, at 315 (6th ed. 2016). In the hearing before the Board, however, Halme never questioned Mr. Grant about any perceived flaws, inaccuracies, or alteration of his photographs.

Halme now argues that the photographs "are illustrative of why it is impossible to accurately determine slope angles or distances in pictures" and laments that Board members "apparently did not appreciate that it is problematic to rely on photographs" in a case such as this one. Resp't's Resp. Br. at 16. The problem, it explains, is that items in a foreground appear larger because they *are* in the foreground, and the relative size of various subjects in the photograph is affected by their distance from the photographer. *Id.* at 18-19.

The "problem" Halme identifies is a phenomenon of perception that a seeing person experiences every moment of their waking life. Halme offers no reason Board members would be incapable of adjusting for this phenomenon in considering the evidence provided by the photographs.

Halme asserts on appeal that "camera angles and focal lengths distort the angle of the slope pictured in each of the Department's photographic exhibits." *Id*. at 18. It did not establish any basis for that argument at the Board hearing, however, and offers no other support for that argument on appeal.

Substantial evidence supported the Board's final decision and order. We reverse the superior court and reinstate the final decision and order of the Board.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Staab, J.